UNITED STATES of America,
Plaintiff-Appellee,

v.

Luz-Estella ALVAREZ–PORRAS, Jose
Garcia-Perez, and Roberto Colon-
Diaz, Defendants-Appellants.

Nos. 181, 188, 202, Dockets 80–1198,
80–1211, 80–1234.

United States Court of Appeals,
Second Circuit.

Argued Sept. 24, 1980.

Decided Feb. 10, 1981.

Charles Lavine, Forest Hills, N. Y., for defendant-appellant Alvarez-Porras.

C. Joseph Hallinan, Jr., New York City, for defendant-appellant Colon-Diaz.

Paul E. Warburgh, Jr., New York City (Axelrod & Warburgh, Charles F. Axelrod, New York City, of counsel), for defendant-appellant Garcia-Perez.

* Hon. Charles H. Tenney, Senior District Judge of the Southern District of New York, sitting by designation.

David V. Kirby, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Eastern District of New York, Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for plaintiff-appellee United States of America.

Before MOORE and KEARSE, Circuit Judges, and TENNEY, District Judge.*

TENNEY, Senior District Judge:

Appellants were convicted after a jury trial in the United States District Court for the Eastern District of New York before Judge Jacob Mishler. They were found guilty of conspiring to import and distribute substantial quantities of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846, 952(a), 960(a)(1), and 963. Appellant Luz-Estella Alvarez-Porras was sentenced to three years' custody and a special parole term of ten years. Appellant Jose Garcia-Perez was sentenced to eight years' incarceration and a special parole term of life. Appellant Roberto Colon-Diaz was sentenced to incarceration under 18 U.S.C. § 5010(b), the Youth Corrections Act.

In challenging their convictions, each of the appellants in this case raises an issue distinct from the others' claims. First, appellant Alvarez-Porras argues that her co-defendants' statements should not have been accepted as her own admissions under the conspiracy exception to the hearsay rule because the government failed to link her to their conspiracy by a fair preponderance of the independent evidence, as required by *United States v. Geaney,* 417 F.2d 1116 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and its progeny. Second, appellant Colon-Diaz argues that, in determining his age for purposes of the juvenile offenders procedures in 18 U.S.C. §§ 5031–42, the trial judge improperly considered an otherwise suppressible statement made after an illegal arrest. Third, appellant Garcia-Perez argues that the fruits of a search of his apartment should have been suppressed be-

cause the Drug Enforcement Administration (DEA) agents who conducted the search acted under the mistaken belief that a valid warrant, properly issued several hours later, had already been signed.[1]

## BACKGROUND

The convictions on appeal grew out of a massive conspiracy to import cocaine from Colombia and to export American currency back to the South American drug suppliers. The prosecuting attorney presented records at trial documenting two million dollars in drug transactions, and he estimated that this drug ring handled $100,000 in narcotics per week. Trial Transcript ("Tr.") at 38, Joint Appendix ("App.") at 149. At the center of the operation was a woman named Cecilia Mesa-Valencia, who enlisted the aid of trusted friends and relatives, as well as their friends and relatives, who together constituted a close-knit group of confidantes for the conduct of criminal activities. A man named Jairo Aristozabal, also known as El Negro, was Mesa-Valencia's lieutenant for distributing cocaine in New York once it had been transported by overland courier from Miami, the point of entry into this country. Appellant Colon-Diaz was an assistant to El Negro, whose brother is appellant Garcia-Perez. Appellant Alvarez-Porras, allegedly a courier for the conspiracy, is the sister of a known courier who had carried a large supply of cocaine from Miami to New York in September 1979, a month before the appellants were arrested. Instrumental in making the government's case was Luis Alberto Castrillon, an informer who infiltrated Mesa-Valencia's inner circle and served as her driver for several months before the case was prosecuted.

Besides this cast of characters, a brief review of the facts will adequately set the stage for discussing the individual defendants' claims. Additional facts will be introduced where needed. Informant Castrillon came to know Mesa-Valencia in July 1979. Tr. at 99–100, App. at 172–73. By overhearing certain conversations at that time, he became aware of her narcotics business, Tr. at 101–05, App. at 174–78, and he asked her to sell him some cocaine, which she said would have to wait for another day. Tr. at 106–07, App. at 179–80. The following month, Castrillon was arrested and jailed from August 1 through 27, at which time Mesa-Valencia bailed him out. At trial, Castrillon stated that "[i]n return for the favor ... she want[ed] me to make a couple of sales for her." Tr. at 108, App. at 181. Already cooperating with the government, the informant agreed and in the fall began chauffeuring the members of the conspiracy on their appointed rounds. In September he drove several people to Virginia, Tr. at 109–11, App. at 182–83, and in early October he regularly drove Mesa-Valencia and her accomplices to spots in Manhattan and Queens where meetings were held, drugs were stored, and transactions were consummated. E. g., Tr. at 118, 121–25, 162–65, 257–63, 271–75, 290–97, App. at 184, 187–91, 196–98, 229–36, 240–44, 251–58. In one instance, Castrillon arranged for Mesa-Valencia to make a face-to-face sale to an undercover agent. Tr. at 305–11, App. at 265–71. As a result of the informant's efforts, the government identified and successfully prosecuted many members of Mesa-Valencia's ring. Some defendants pleaded guilty; others were convicted after a jury trial before Judge Mishler in the Eastern District of New York.

## ALVAREZ–PORRAS AND THE *GEANEY* STANDARD

■ A criminal defendant's out-of-court statements, ordinarily barred by the hearsay rule, are admissible against him as non-hearsay under Federal Rule of Evidence ("Rule") 801(d)(2)(A), which exempts from the hearsay rule any "statement ... of-

---

1. Appellants Alvarez-Porras and Garcia-Perez also challenge the imposition of special parole terms. In light of the Supreme Court's decision last year in *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), the government concedes that this portion of the sentences should be vacated. We agree and therefore vacate the special parole terms imposed under 21 U.S.C. §§ 846 and 963. *See also United States v. Grammatikos*, 633 F.2d 1013, 1025 (2d Cir. 1980).

fered against a party" as an admission. *United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974); *United States v. Matlock*, 415 U.S. 164, 172, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Similarly, Rule 801 defines a coconspirator's statements as nonhearsay if made "during the course and in furtherance of the conspiracy." F.R.E. 801(d)(2)(E). *See Glasser v. United States*, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942). But such statements cannot be used to substantiate the underlying conspiracy, lest the prosecution be allowed to invoke an important hearsay exception by presenting only hearsay proof of the conspiracy itself. The government must first make "a sufficient showing, by independent evidence, of a conspiracy among one or more other defendants and the declarant," *United States v. Nixon, supra*, 418 U.S. at 701, 94 S.Ct. at 3104.

On this point, Judge Friendly wrote for the Second Circuit in *United States v. Geaney, supra*, that

the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances.

417 F.2d at 1120. This standard, the court noted, is lower than the standard of evidence sufficient to submit a charge of conspiracy to the jury. *Id.* at 1119–20; *United States v. Ragland*, 375 F.2d 471, 477 (2d Cir. 1967), *cert. denied*, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968); *United States v. Ross*, 321 F.2d 61, 68 (2d Cir.), *cert. denied*, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963). Once the "threshold requirement for admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant," *United States v. Ragland, supra*, 375 F.2d at 477, the conspirators' statements are admissible and they "might tip the scale" in favor of the defendant's guilt, *United States v. Geaney, supra*, 417 F.2d at 1120. The principles laid out in *Geaney* have been adopted by subsequent cases following its lead. *E. g.,*

*United States v. Cambindo Valencia*, 609 F.2d 603, 631 (2d Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980); *United States v. DiPalermo*, 606 F.2d 17, 21 (2d Cir. 1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1274 (1980); *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979), *cert. denied*, 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1980); *United States v. DeFillipo*, 590 F.2d 1228, 1236 (2d Cir.), *cert. denied*, 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979); *United States v. Ziegler*, 583 F.2d 77 (2d Cir. 1978).

In this case, the following facts support a finding by a preponderance of non-hearsay evidence that Alvarez-Porras was a member of the conspiracy:

(1) Her passport showed that she had arrived from Colombia on October 9, 1979, and had entered the United States at Miami, where the conspiracy brought in its cocaine. Tr. at 1786.

(2) She is the sister of a known courier. Tr. at 1788.

(3) Mesa-Valencia purchased a plane ticket to Colombia for Alvarez-Porras, and the appellant contributed toward that purchase. Tr. at 1789.

(4) In Alvarez-Porras' presence, Mesa-Valencia introduced her to the informant as the courier who had just "brought the stuff in from Colombia." All three were standing in close proximity at the time, and they were in the home of the woman who served as the conspiracy's banker. Tr. at 162–64, App. at 196–97.

(5) On the night of October 15, 1979, in the informant's presence, Mesa-Valencia asked appellant to accompany her "to get the package for his friend," to which Alvarez-Porras responded, "Yes, early in the morning." Tr. at 397–400, App. at 344–47.

Upon considering all of these facts and circumstances, we are convinced that Judge Mishler correctly found a sufficient link between the appellant and the conspiracy to admit otherwise excludable statements as the appellant's own admissions. Although the first three facts listed above might be as consistent with innocence as with guilt,

they no longer appear innocuous when considered in light of the fourth and fifth facts, for "pieces of evidence must be viewed not in isolation but in conjunction." *United States v. Geaney, supra,* 417 F.2d at 1121. There can be little doubt about the significance of the two conversations related by the informant. Appellant's silence after Mesa-Valencia's inculpatory introduction constituted an adoptive admission under Federal Rule of Evidence 801(d)(2)(B); *United States v. Williams,* 577 F.2d 188, 193–94 (2d Cir. 1977), *cert. denied,* 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978). And the appellant's assent to pick up a package with Mesa-Valencia, in light of the surroundings, can only have been in connection with a drug transaction. "Judges are not required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich,* 550 F.2d 1294, 1300 (2d Cir. 1977). Given Alvarez-Porras' close relations with other members of the conspiracy, her presence and participation in incriminating conversations, and the coincidence of her itinerary with the travel needs of the drug ring, we are satisfied that the court below properly applied the *Geaney* standard.

In reaching this conclusion, we stress that the pivotal importance of the fourth and fifth facts listed above does not hinge on their truth or falsity. Whether or not Alvarez-Porras had just "brought the stuff in from Colombia," and whether or not she actually accompanied Mesa-Valencia the next morning, these statements are significant merely because they were made. In evidentiary terms, the government can introduce them as "verbal acts," "offered not to prove the truth of the matter asserted but to show [the defendants'] involvement in the conspiracy." *United States v. DeFillipo, supra,* 590 F.2d at 1236 n.13. "The important thing is that [Mesa-Valencia] made the statements, not their truth or falsity." *United States v. Geaney, supra,* 417 F.2d at 1121 n.4.

## GARCIA–PEREZ AND THE FOURTH AMENDMENT

Government agents conducted three searches of Garcia-Perez' apartment at 266 Nagle Avenue in Manhattan. The first was a cursory weapons search pursuant to an arrest which the lower court found illegal because "the arresting officers were unaware of the arrestees' identities. The sole bases for their belief that the suspects were guilty of criminal conduct [were] their presence at an apartment which the officers had probable cause to believe was a place where narcotics were being stored and the fact that one of the individuals was carrying a plastic bag." Memorandum of Decision and Order, dated February 26, 1980 at 43, App. at 66. The security search turned up a .357 Magnum revolver, a .380 Colt automatic revolver, and a triple-beam scale in view under the kitchen table. It should be noted that the officers did not forcibly enter to make the arrests, nor did they even approach the apartment until the suspects emerged, at which point they were arrested and taken back into the apartment. There was no suggestion that the arrests were a pretext for gaining entry, although the agents clearly acted without probable cause.

The second search occurred approximately two hours later. The government agents had held the suspects in custody and awaited word that a search warrant, already applied for, had been issued for Garcia-Perez' apartment, which informant Castrillon had identified as a "stash pad" where drugs, money, and records were stored. When a transmission finally came over the officers' portable radio, it was somewhat distorted because they were indoors, but the officers thought it said that the warrant had been signed. The ensuing search turned up a substantial quantity of tangible, inculpatory evidence: another handgun, a large amount of cash, and numerous papers, notebooks, and photographs related to the conspiracy's transactions. While this search was under way, one of the officers left the apartment to make a phone call and returned to inform his colleagues that a warrant had not yet been signed. The officers then temporarily discontinued their search. When two other officers arrived with the valid warrant in hand, the third

search began and yielded a few more incriminating items: $100 in cash, a black camera case, a lease on a Riverside Drive apartment, a utility bill, and several boxes of baggies.

At a suppression hearing, the defendants argued that the fruits of all three searches should be suppressed because there was no justification for the initial security search; there was no justification for a full-scale warrantless search of the apartment; and the third search, conducted pursuant to a warrant, was invalid because its supporting affidavit contained material misrepresentations. The government countered that the security search was justified even if the arrests were illegal; that the second search was in good faith, rendering the exclusionary rule inappropriate; and that the third search, pursuant to a valid warrant, would have inevitably turned up all of the evidence discovered in the second search. The district court admitted all of the evidence seized on the basis of the government's third point, thereby directly raising for our review the question of an inevitable-discovery exception in this circuit.

In order to effectuate the commands of the Fourth Amendment, to deter police misconduct, and to safeguard the integrity of the judicial process, the Supreme Court has fashioned the exclusionary rule which makes inadmissible at trial any evidence derived from the violation of an individual's right to be free from illegal searches and seizures. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). But the Court has cautioned that not ... all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).

*Wong Sun v. United States, supra,* 371 U.S. at 487–88, 83 S.Ct. at 417. In applying the exclusionary rule, a trial court must focus on the existence of "exploitation" of the "primary illegality." "[T]he primary issue [is] whether the unlawful police behavior bore a causal relationship to the acquisition of the challenged testimony." *United States v. Crews,* 445 U.S. 463, 469, 100 S.Ct. 1244, 1248, 63 L.Ed.2d 537 (1980). "[O]f course, ... the question of causal connection in this setting, as in so many other questions with which the law concerns itself, is not to be determined solely through the sort of analysis which would be applicable in the physical sciences. The issue cannot be decided on the basis of causation in the legal sense alone, but necessarily includes other elements as well." *United States v. Ceccolini,* 435 U.S. 268, 274, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268 (1978).

Although "[t]he exclusionary prohibition extends as well to the indirect as the direct products of" constitutional invasions, *Wong Sun v. United States, supra,* 371 U.S. at 484, 83 S.Ct. at 416, the government still has the opportunity to refute "the premise that the challenged evidence is in some sense the product of illegal governmental activity," *United States v. Crews, supra,* 445 U.S. at 471, 100 S.Ct. at 1250. Even if "the challenged evidence was acquired by the police *after* some initial Fourth Amendment violation, ... the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." *Id.* (emphasis in original).

There are "three commonly advanced exceptions to the exclusionary rule—the 'independent source,' 'inevitable discovery,' or 'attenuation' doctrines," *id.* at 470, 100 S.Ct. at 1249. *E. g., United States v. Ceccolini, supra* (attenuation); *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939) (attenuation); *Silverthorne Lumber Co. v. United States, supra,* 251 U.S. at

392, 40 S.Ct. at 182 (independent source); *United States ex rel. Owens v. Twomey*, 508 F.2d 858, 865 (7th Cir. 1974) (inevitable discovery). *But see Fitzpatrick v. New York*, 414 U.S. 1050, 94 S.Ct. 554, 38 L.Ed.2d 338 (1973) (White, J., dissenting from denial of certiorari) (questioning inevitable discovery theory). Each of these exceptions rests, most basically, on the lack of a sufficiently close connection between the state's wrongdoing and the invasion of the defendant's reasonable expectation of privacy. Furthermore, despite the identification of discrete headings for the various exceptions, their applications and rationales overlap enough that we view them more as helpful guides than as rigid tests. In each case, we must weigh the extent of any illegality, the probative value of any *legally* obtained information, and the relationship between the two, always with the hope of vigorously enforcing the Fourth Amendment without imposing ineffective constraints on criminal investigations. As this court commented in *United States v. Marchand*, 564 F.2d 983, 994 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978):

> It is true, of course, that if the sole guiding beacon in a Fourth Amendment case were the maximization of deterrence, all evidence obtained by illegal means in any significant part would have to be suppressed, even though there was a sufficient lawful basis for securing it. But the Supreme Court's decisions on other points of Fourth Amendment law demonstrate that it is not disposed to tilt the balance that far.

■ The government and Garcia-Perez seem to agree on which of this circuit's cases are most directly on point; they disagree, of course, on how to interpret and apply the pertinent authority. These precedents are *United States v. Marchand, supra; United States v. Jarvis*, 560 F.2d 494 (2d Cir. 1977), *cert. denied*, 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978); *United States v. Galante*, 547 F.2d 733 (2d Cir. 1976), *cert. denied*, 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977); *United States v. Falley*, 489 F.2d 33 (2d Cir. 1973); *United States v. Cole*, 463 F.2d 163 (2d Cir.), *cert.*

*denied*, 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972). Although these decisions do not definitively dispose of this case, we are convinced that under the principles articulated in these and other Fourth Amendment cases, the items seized in Garcia-Perez' apartment need not be suppressed. Moreover, we reach this decision without embracing or rejecting the terms, "inevitable discovery" and "good faith," as exceptions to the exclusionary rule. In this complicated area, it is wiser to let the cases speak for themselves and to encourage careful analysis and argument than to endorse vague headings which add little to our understanding of the problems and which, because of their symbolic impact, may lead inadvertently to a weakening of the Fourth Amendment's protection. In various ways, the issues of causation and good faith will undoubtedly enter into the court's handling of the exclusionary rule. *See, e. g., United States v. Ajlouny*, 629 F.2d 830, 841 (2d Cir. 1980); *United States v. Dien*, 609 F.2d 1038, 1046 (2d Cir. 1979). But the law as it stands is flexible enough to accommodate the sound disposition of cases without "[t]he announcement of a radical change in the scope of the exclusionary rule [which] creates a host of interpretive problems." *United States v. Williams*, 622 F.2d 830, 849–50 & n.4 (5th Cir. 1980) (Rubin, J., concurring specially).

Turning now to the specific cases mentioned, the most recent authority in this Circuit is *United States v. Marchand, supra.* There, a federal indictment for drug violations was handed down in Vermont against the defendant. An arrest warrant was issued. When the government became aware that Marchand had fled to Florida, it forwarded his picture to local authorities and contacted a "specially trained, assigned and experienced officer" to explain the case. 564 F.2d at 988, 992. Sometime later, Marchand was in an apartment where another suspect was arrested on similar but unrelated drug charges. Among the arresting officers was the one familiar with Marchand's case. In the course of the other man's arrest, Marchand's wallet, lying on a

table, was searched and his driver's license was found. Based on the license, as well as the photograph and information forwarded from Vermont, Marchand was also arrested.

In upholding the denial of a motion to suppress the evidence seized pursuant to this arrest, this court said that Marchand would have been recognized as the person subject to arrest in Vermont because of "the photograph . . . [despite] the reinforcement afforded by the discovery of Marchand's name [on the license]." *Id.* at 992. That case, however, only stands for the proposition that the valid execution of a valid arrest warrant is not invalidated because of some interceding minor element of illegal police behavior. It does not reach this case where no search warrant had been issued at the time of the major search of Garcia-Perez' apartment.

Similarly, the decisions in *United States v. Falley, supra,* and *United States v. Cole, supra,* should be understood as involving a combination of legal and illegal police work, in such a mix that the defendants' ultimate convictions were not sufficiently tainted to warrant reversal. In *United States v. Falley,* the defendants were convicted on drug charges for smuggling large quantities of Indian hashish into the United States in imported table tops and brass nameplates. The government conducted a "saturation investigation" of customs brokers, which revealed importation documents for the defendants' goods. The prosecution's case also presented tax returns, travel documents, a suitcase containing drugs seized by airport inspectors, and informants' testimony. Against this background, this court rejected the claim that an illegal search of the defendants' home mandated reversal because an address book containing their broker's name had been seized. The court found that the government's investigation proceeded on sufficient information independent of the illegally obtained materials and that "[e]ven if the address book had shortened or facilitated the investigation, it did not supply fruit sufficiently poisonous to be fatal." *United States v. Falley, supra,* 489 F.2d at 40.

In *United States v. Cole, supra,* the defendant who was convicted of tax violations argued that the Internal Revenue Service's "saturation investigation" of his advertising agency was closely enough connected to an illegal FBI wiretap that his conviction should be reversed. There was no claim that any evidence obtained from the wiretap was offered at trial, just that the conversations overheard led to deeper inquiries. This court, however, found the government agents would not have sought, nor would they have obtained, authority for an expensive, time-consuming search solely on the basis of the statements tapped. Instead, the "saturation investigation" was requested and authorized on the basis of an informer's revelations that the defendant failed to report "as much as '200,000 bucks' " a week of cash income skimmed from Las Vegas casinos in which he held an interest.

In both *Falley* and *Cole,* this court spoke about the causal connections, if any, between Fourth Amendment violations and the evidence ultimately used in convicting the defendants. We explained: "If the evidence produced by the investigation was simply the normal output of that investigation, then the investigative findings have not been tainted directly." *United States v. Falley, supra,* 489 F.2d at 41. "Conduct is not the legal cause of an event if the event would have occurred without it. Prosser, Torts § 41 at 239 (1971 ed.)." *United States v. Cole, supra,* 463 F.2d at 173. But these dicta, as pithy and quotable as they may be, should not be taken to decide issues not considered by those panels. As Chief Justice Marshall commented in *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821):

> general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.

*Id.* at 398 (referring to dicta appearing in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)). The *Cole* and *Falley*

decisions did not announce a general rule allowing the courts to inquire whether, despite any illegality, the government's evidence would have been discovered anyway. In both of those cases, the government conducted a legal investigation which was supported by sufficient legal grounds that the additional illegal grounds did not mandate reversal. In this case, the government had adequate legal grounds for searching Garcia-Perez' apartment, but the agents had not fully complied with the warrant requirement at the time of the search.

Whereas *Marchand, Falley* and *Cole* rest most solidly and directly on the independent-source exception, this court's decisions in *United States v. Jarvis* and *United States v. Galante, supra,* suggest a broader exception. In *Galante,* the defendants were convicted of conspiring to possess stolen goods. After one of the defendants, Cohen, was arrested while attempting to sell some of the stolen merchandise, the FBI searched the basement of Cohen's store under an illegal warrant and there discovered the remainder of the contraband. Soon thereafter, Cohen began cooperating with the FBI, and he helped force a coconspirator to pick up the goods at the store, where the FBI nabbed this second defendant. Despite the initial illegal search, however, this court refused to suppress the evidence subsequently seized. Alternative holdings were articulated. First, because the FBI had kept Cohen's store under constant surveillance from the time of his arrest, the FBI would have captured the other conspirators whenever they eventually showed up to retrieve their loot, thus negating a finding that the illegal search was the but-for cause of the ultimate seizure of goods. Second, "under the totality of the circumstances, the seizure of the [goods] . . . was the product of Cohen's voluntary cooperation," which "broke the chain of causation" and constituted an "independent, intervening [cause]." *United States v. Galante, supra,* 547 F.2d at 741–42.

Despite the *Galante* court's initial hesitance about the consent doctrine, *see id.,* at 736 n.2, its ultimate finding of cooperation provides a much stronger basis for the deci-sion than the first holding, which is rife with uncertainty. *But see id.* at 742 (Kaufman, J., concurring). Without a doubt, "[i]f the FBI had not made the initial search, but had simply placed the [store] under surveillance on the information set out in the search warrant, the seizure . . . would have been valid." But that is a big "if." Two judges on the *Galante* panel refused to state with certainty that the government would have found the goods and made the arrests anyway. The majority decision stated that the FBI "would in all likelihood have placed the [store] under surveillance," making it "not at all clear that the initial, illegal search was the but-for cause of the subsequent seizure." *Id.* at 740. But these two judges rested their decision on the first defendant's cooperation. Only Judge Kaufman rejected the cooperation theory altogether—because of its susceptibility to abuse—and endorsed the holding because "on the unusual facts in this case . . . [i]t is inconceivable" that the government would not have found the goods. *Id.* at 742. It should be stressed that none of the judges in *Galante* advocated a broad doctrinal adjustment allowing trial courts to speculate about the lack of causation. The two-judge majority intimated that the government's probable surveillance negatived causation, but refused to rest on that ground, and Judge Kaufman was moved by the "unusual facts" and the virtual certainty of the FBI's next moves. In addition, the agents in *Galante* had applied in good faith for a warrant, which was issued because of an "understandable mistake of the magistrate" who could not have foreseen a subsequent Second Circuit decision invalidating the affidavits in support of the search. *Id.* at 740. In sum, *United States v. Galante* rests on much narrower grounds than some of its language may suggest.

The opinion in *United States v. Jarvis, supra,* has similarly broad implications. There, the court invalidated a "John Doe" arrest warrant for failure to satisfy the particularity requirement, but nonetheless refused to suppress the defendant's photograph and palm print which were obtained

after his arrest which occurred at the defendant's home following a forcible entry made without exigent circumstances. Despite the "serious question" raised by the arrest—a question recently answered by the Supreme Court, *see Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 65 L.Ed.2d 639 (1980)—the Second Circuit admitted the challenged evidence because

> [h]ad the agents waited outside of Jarvis' home, they could have arrested him, when he emerged, based solely on probable cause.... The illegal arrest thus was not a "but for" cause for the introduction of the evidence .... [T]he failure of the police to wait for Jarvis to emerge was harmless in terms of the photo and fingerprint evidence obtained.... This is not a case where the government "exploits" an unlawful arrest by obtaining a conviction on the very evidence not shown to have been otherwise procurable, which it hoped to obtain by its unconstitutional act.... Here "the arrest made in good faith turns out to [be] illegal" because the prosecutor failed to insert the known name or description in the warrant.

*United States v. Jarvis, supra*, 560 F.2d at 498–99. This passage seems to invite courts to speculate about what might have happened if the police had acted differently—if they had waited outside the defendant's house, if they had sought a search warrant making the evidence "otherwise procurable," if they had offered a "known name or description" instead of "John Doe." In that particular case, the result announced may have been appropriate because Jarvis had been identified from police photographs by his accomplice's mother and because the only evidence challenged was a photograph and palm prints.

This last point is very important. In discussing identification evidence, this court has stated that

> where flagrantly illegal arrests were made for the precise purpose of securing identifications that would not otherwise have been obtained, nothing less than barring any use of them can adequately serve the deterrent purpose of the exclusionary rule.

*United States v. Edmons*, 432 F.2d 577, 584 (2d Cir. 1977). In that case, the FBI rounded up a few suspects from the scene of a prior crime "on a mere pretext" in order to display them to the agent who had witnessed the crime. *Id.* at 583. Without these arrests, the in-court identification of the defendants could not have occurred. But the court cautioned:

> We are not obliged here to hold that when an arrest made in good faith turns out to have been illegal because of lack of probable cause, an identification resulting from the consequent custody must inevitably be excluded.

*Id.* at 584. In *Jarvis*, unlike in *Edmons*, the officers knew the suspect's name, face and whereabouts. The only evidence seized merely corroborated his identity, which was already precisely known.

Despite the apparent breadth of the cases discussed above, we can decide this case without adding to the uncertainty they may have engendered, and we choose to do so. The danger in applying an expansive interpretation of *Jarvis* and *Galante* to this case is that they suggest, and Judge Mishler adopted below, a broad inevitable-discovery exception whenever a court is satisfied that any government illegality was not the but-for cause of the discovery of any incriminating evidence. In many cases, dictum about a general but-for exception—based on the Supreme Court's phrase in *Wong Sun v. United States, supra*, 371 U.S. at 487, 83 S.Ct. at 417—will not change the result because the related, but separable, independent-source exception also applies. *E. g., United States v. Cole, supra.* But the difference between the doctrines is crucial. The independent-source exception requires a showing that, even if the constable blundered once, he has taken enough proper steps that his lawful investigation is not thereby invalidated. A broad but-for exception, on the other hand, encourages speculation on whether a blunderbuss constable *might* eventually have developed a lawful basis for his investigation. A judge would

have to conjecture about what the police would have done, or might have done, or could conceivably have done, in deciding whether illegal conduct which led to incriminating evidence was the but-for cause of the seizure. And these determinations would have to be made retrospectively, after the inculpating evidence has been incorporated into the government's case, a time when the purposes of the Fourth Amendment and the exclusionary rule may seem least compelling and the need for a conviction may seem paramount. *See United States v. Karathanos*, 531 F.2d 26, 35–36 (2d Cir.) (Oakes, J., concurring), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976).

At its furthest and most troubling extension, a but-for exception could be used to justify searches simply on the basis of probable cause and reasonableness, without regard for the warrant requirement, because the officers conducting the search were correct in believing they had a lawful basis for the search. Where exigent circumstances necessitate an exception to the warrant requirement, and justify resort instead to the standard of reasonableness, our jurisprudence has bent to accommodate these unusual circumstances. But we will not risk the whittling down of the warrant requirement, without regard for compelling circumstances vel non, by justifying the admission of evidence under a broad inevitable-discovery exception to the exclusionary rule.

In advocating an exception dubbed "inevitable discovery," the government cites cases which purportedly illustrate a clear split among the circuit courts. Government's Brief at 21 n.10. The heading "inevitable discovery" is generally traced to the Seventh Circuit's decision in *United States ex rel. Owens v. Twomey, supra*, 508 F.2d at 865–66. *See United States v. Crews, supra*, 445 U.S. at 470 n.11, 100 S.Ct. at 1249. That doctrine was unnecessary to the *Owens* decision, however, and the same result could have been reached without relying on it.

In *Owens*, the defendant abducted two people whom he held captive for six to seven hours, part of which time was spent in one victim's car, part in the apartment the defendant shared with his common law wife. After the victims were released, one of them led the police back to the suspect's apartment which the police illegally searched and where the police illegally seized a photograph of the defendant and an address book revealing his companion's work address. At trial the defendant moved to suppress the victim's in-court identification as tainted by the photo and to suppress his companion's testimony because it was the direct result of the seizure of the address book. The first claim was ludicrous; the victim had spent over six hours, most of them face-to-face, with his abductor, and his in-court identification was not affected in the least by the photograph. The second claim, while slightly more troublesome, could easily have been decided as it was without an inevitable-discovery rule. There was a legal independent source for the authorities' knowledge of the companion's identity and for lawfully presenting her live testimony. Besides, even if her identity had been uncovered solely through illegal means, she was not a defendant in the case, a factor subsequently stressed by the Supreme Court in considering the admissibility of witness testimony arrived at by illegal means. *See United States v. Ceccolini, supra*, 435 U.S. at 275, 98 S.Ct. at 1059. Similarly, the other cases cited in the government's brief as "appear[ing] to accept the [inevitability] doctrine" can also be explained on the basis of the more firmly established exceptions to the exclusionary rule. *United States v. Seohnlein*, 423 F.2d 1051, 1053 (4th Cir.), *cert. denied*, 399 U.S. 913 (1970); *Wayne v. United States*, 318 F.2d 205, 209 (D.C.Cir.), *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963).

In a case factually similar to this one, *United States v. Griffin*, 502 F.2d 959 (6th Cir.), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974), the court refused to extend the exclusionary rule's exceptions to cover "police who believe they have probable cause to search ... without a warrant

merely because they plan subsequently to get one." *Id.* at 961. There several officers were sent to "secure"—that is, forcibly enter and occupy—what they knew to be an empty apartment while awaiting a valid warrant which was ultimately issued. When the defendant arrived home, he was placed under arrest, and when the warrant arrived, a thorough search was conducted. In upholding the district court's suppression of the evidence seized, the Sixth Circuit wrote:

> The assertion by police (after an illegal entry and after finding evidence of crime) that the discovery was "inevitable" because they planned to get a search warrant and had sent an officer on such a mission, would as a practical matter be beyond judicial review. Any other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment.

*Id.*

In *Griffin*, the purposes of the exclusionary rule were served by suppressing the evidence, lest the police be encouraged to execute warrants before they have been issued and before they have been properly presented to those persons at the scene of the intended search. On the facts of this case, by contrast, as supported by the district court's findings, the purposes of the exclusionary rule would not be served by suppressing the evidence uncovered in Garcia-Perez' apartment. We stress, however, that our decision rests not on a broad exception for inevitably discoverable material, but on the narrow showings made at the suppression hearing. As the Fifth Circuit has commented, "the relevant issue in each case is broader than a sterile 'but for' inquiry." *Parker v. Estelle*, 498 F.2d 625, 629 (5th Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975). Instead, the trial courts should consider the principles underlying the exclusionary rule, as discussed in *Wong Sun v. United States, supra*. It is a misuse of *Wong Sun*, which aims at analytical refinement, to read its discussion of exclusionary rule exceptions as if it were a legislative enactment expressing a few immutable terms which must be applied to all cases. The *Wong Sun* opinion elaborates on the underlying rationale of the exclusionary rule and instructs trial courts on how to apply the rule and its rationale to varying cases. With that mandate in mind, we now turn to the facts of this case.

Even though the illegal warrantless search led immediately to the seizure of the bulk of the incriminating evidence taken from Garcia-Perez' apartment, we are convinced that the purposes of the exclusionary rule would not be served by excluding that evidence illegally seized. The district court endorsed an inevitable-discovery rule and found that the illegal search was not the but-for cause of the discoveries because "there is no need to speculate as to whether the evidence seized ... would ultimately have been found. A warrant was, in fact, issued. A search was, in fact, conducted." App. at 77. We agree that the facts here reduce speculation to a minimum; we choose also to stress the agents' good faith in trying to comply with the warrant requirement. Despite some conjecture that the agents should have known that their radios were inoperative, see Brief for Appellant Garcia-Perez ("Garcia-Perez Brief") at 4, there was no finding below that the agents fabricated their interpretation of the first message. Indeed, they waited two hours after the illegal arrest to begin their search and discontinued that search when their mistake was discovered. *Cf. United States v. Vasquez*, 638 F.2d 507, at 531, 532 (2d Cir.1980) (officers may have violated Fourth Amendment by exceeding reasonable bounds of security search after arrest).

As a general matter, we agree with the appellant that "[t]o allow officials to make an unlawful search and then repeat the search pursuant to a warrant would sanction the very misconduct the exclusionary rule was intended to proscribe." Garcia-Perez Brief at 12. *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). But on the unusual facts in this case, suppressing the evidence seized would not serve the deterrent purposes of the exclu-

sionary rule. *United States v. Peltier*, 422 U.S. 531, 541–42, 95 S.Ct. 2313, 2319–20, 45 L.Ed.2d 374 (1975); *Desist v. United States*, 394 U.S. 244, 254 n.24, 89 S.Ct. 1030, 1036, 22 L.Ed.2d 248 (1969); *United States v. Ajlouny, supra*, 629 F.2d at 840–41. We stress, however, that in cases such as this, the government must bear a heavy burden in showing that an otherwise inexcusable departure from the warrant requirement should be overlooked.

## APPELLANT COLON–DIAZ' AGE HEARING

Appellant Colon-Diaz was among those illegally arrested outside Garcia-Perez' apartment. Before trial he moved for treatment as a juvenile under 18 U.S.C. §§ 5031 *et seq.*, which establishes special procedures for prosecuting an act of "juvenile delinquency," defined as "the violation of a law of the United States committed by a person prior to his eighteenth birthday." 18 U.S.C. § 5031. One of the arresting officers testified at an age hearing that Colon-Diaz represented at the time of the illegal arrest that his age was 19, but to the Drug Enforcement Administration, the United States Attorney, and the trial court, he stated that his birth date was January 17, 1962, which would have made him approximately four months shy of 18 at the time of his arrest. In light of appellant's lack of credibility, his failure to produce concrete evidence of age, and the original representation made upon arrest, Judge Mishler found that the government had met any burden it bore to prove that Colon-Diaz was over 18 at the time he violated the federal narcotics laws. App. at 423–24.

On appeal, Colon-Diaz argues that the government must bear the burden of proving a juvenile's age, that the government made no independent showing of age in this case, and that the trial court erred in allowing the government to introduce the defendant's original statement on cross-examination since that statement was the suppressible fruit of an illegal arrest. The government, on the other hand, argues that all information on age—whether or not suppressible at trial—is admissible at a pre-trial hearing not related to guilt or innocence, that pedigree information is not suppressible even if illegally obtained, and that a defendant must bear some burden of proving pedigree when it is beyond the reach of government investigation (as in this case, which involves foreign nationals as defendants). On balance we are persuaded that Judge Mishler acted properly in admitting Colon-Diaz' prior statement at the age hearing and that the defendant's age of 19 was adequately supported by the record. In so deciding, however, we need not reach all of the government's arguments.

There are no reported cases on the burden of proof or admissibility of evidence in a hearing to determine whether a criminal defendant should be treated as a "juvenile" under 18 U.S.C. §§ 5031 *et seq.* Judge Mishler stated below that he "would say that the government has the obligation of proving that [Colon-Diaz is] an adult," App. at 361, to which the prosecution responded: "Our position is that if he doesn't give us verifiable personal data to determine his age that the burden should fall upon him because it is within his power and not the government's power," *id.*, to which the judge replied, "That is true as to many issues that the government must prove," *id.*

■ We agree with the principles expressed in this exchange. In this case, the record included the defendant's own statement to the arresting officer. Were it not for the arrest's illegality, this statement would have been admissible at trial, as well as at the age hearing, to impeach the defendant's credibility if he took the stand and to prove the truth of the matter if it constituted an admission. Fed.R.Evid. 801. Even with an illegal arrest, however, the statement was still admissible at the age hearing for its truth and for impeaching the defendant.

In arguing against all use of the evidence at the age hearing, the appellant invokes the Supreme Court's decisions in *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), and *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145

(1925). But we do not find them applicable here. Those cases involved the use of facts illegally obtained to prove, at trial, the elements of the offense charged. The age hearing, by contrast, only determines which set of procedures will be used to prosecute the defendant for his crimes. The government appropriately refers the court to the many non-trial stages at which the exclusionary rule is not enforced. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (grand jury); *Giordenello v. United States*, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958) (preliminary hearings); *United States v. Schipani*, 435 F.2d 26 (2d Cir. 1970), *cert. denied*, 401 U.S. 983, 91 S.Ct. 1198, 28 L.Ed.2d 334 (1971) (sentencing); 18 U.S.C. § 3146(f) (bail hearings). Each of these steps is at least as important for the defendant as the age hearing, and probably more so, because the government must marshal evidence to substantiate the defendant's commission of the crime and his culpability. The age hearing does not raise these crucial issues; it turns on the objective fact of age.

■ In *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Supreme Court held that states may constitutionally impose on defendants the burden of proving an affirmative defense. In that case, proof of extreme emotional disturbance could reduce a charge of second-degree murder to manslaughter. *Cf. Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (states may not constitutionally shift to defendant the burden of disproving an element of the crime). In this case, evidence of age does not constitute an element of the crime or an affirmative defense. Therefore, even though age is pertinent to the treatment the defendant receives during prosecution and after a conviction, if any, the Constitution is not offended by requiring the defendant to come forward with credible evidence of his minority.

In addition, because of the parties' relative access to pedigree information, we hold that impugning a defendant's credibility can adequately meet the government's burden of proving age in an appropriate case. That is, in the absence of hard information—either documentary evidence or, as in this case, a prior statement—the defendant cannot simply refuse to testify and then argue that the government has not met its burden of proving all elements of the crime. On the other hand, if a defendant gives accurate verifiable information about other matters, his claim of age should be given greater weight than if his other statements are found unreliable.

■ At the age hearing in this case, the Court focused on the defendant's intelligence and credibility—whether he understood his response to the question about age put by the arresting officers and whether his subsequently revised answer deserved belief. In the course of the hearing, the prosecution presented many details damaging to the defendant's credibility: Colon-Diaz said he was from Barrio Obrero, in Aguadilla, Puerto Rico, but Barrio Obrero is in San Juan, App. at 398; he gave his height and weight in metric measurements, used in Colombia, but not in Puerto Rico, *id.* at 398–99; he appeared Colombian to two experienced officers, natives of Puerto Rico, *id.* at 402, 413; he gave non-existent addresses for his apartment in Manhattan and for his mother's home in Puerto Rico, *id.* at 391, 417; and no birth records could be found in Puerto Rico for the defendant, *id.* at 417.

Judge Mishler questioned whether these inconsistencies were caused by the defendant's caginess or by his lack of comprehension of the proceedings. Ultimately, however, the judge found that Colon-Diaz' original statement (that he was 19) was the truth intelligently spoken by a suspect who understood the question posed. App. at 421–24. This finding was fully supported by the record of the hearing. Moreover, the judge left open the possibility of listening to additional evidence if any was uncovered, but none has been forthcoming.

The case is remanded in order that the district court may amend the judgments of conviction to vacate the sentences of special parole, see note 1 *supra*. In all other respects, the judgments below are affirmed.