**UNITED STATES of America**

v.

**Lisa Ann MORRIS.**

**Crim. No. HM–87–0341.**

United States District Court,
D. Maryland.

April 11, 1988.

Breckenridge L. Willcox, U.S. Atty., and Hollis Raphael Weisman, Asst. U.S. Atty., Baltimore, Md., for U.S.

Fred Warren Bennett, Federal Public Defender, and Stephanie J. Batcheller, Asst. Federal Public Defender, Baltimore, Md., for defendant.

### MEMORANDUM AND ORDER

HERBERT F. MURRAY, District Judge.

This case is here on appeal from a verdict of the United States Magistrate finding Lisa Ann Morris guilty of possession of phencyclidine, and from the sentence imposed pursuant to the verdict. This Court has jurisdiction of this appeal pursuant to 18 U.S.C. § 3402. The Court has reviewed the opposing memoranda of counsel, as well as the tape recordings of the proceedings below, and is now prepared to rule. No oral hearing is necessary.

Lisa Ann Morris, the appellant, consented to a trial before a United States Magistrate on charges of possession of a concealed weapon and possession of a controlled dangerous substance, to wit, phencycledine, or PCP. The Magistrate granted Morris' motion for judgment of acquittal on the concealed-weapon charge. He found her guilty of possession of PCP, though he specifically confined this verdict to the PCP that was found in her purse. Morris appeals from this conviction on the grounds that the PCP in her purse should have been suppressed as the product of an unlawful search and seizure.

In the proceedings below, the Magistrate entertained motions to suppress by Morris and another defendant, Reese Hardison, who was with Morris at the time of her arrest. At a joint hearing on these motions, the government adduced sufficient evidence for the Magistrate to find the following facts.

At about 2:00 p.m. on January 11, 1987, Officer Eddie Ramos of the United States Park Police received a phone call at the Greenbelt substation from a person who reported seeing a white Toyota pickup truck being driven erratically, as though the driver were intoxicated, on the Baltimore–Washington Parkway.[1] Officer Ramos left the substation and proceeded north on the Parkway. Shortly thereafter, he came upon a white Toyota pickup truck parked on the shoulder of the Parkway with its left rear wheel on the white line that separates the shoulder from the travelled portion of the road. Officer Ramos approached the vehicle from the passenger side to avoid walking on the roadway. He observed a male, later identified as Hardison, sitting in the driver's seat of the vehicle and a female, later identified as Morris, sitting in the passenger's seat. Officer Ramos asked what the problem was. Hardison did not respond to this question and appeared to be in a stupor. Morris responded that they had stopped simply to watch the traffic go by. Officer Ramos then asked Hardison to move the vehicle completely off the roadway. He continued to stare trance-like and did not respond. Officer Ramos asked for Hardison's license. Hardison fumbled for his wallet but never produced the license. At this point, Officer Ramos asked Hardison and Morris to get out of the truck. Both exited the vehicle on the passenger side. Hardison staggered as he got out but claimed

1. The Baltimore–Washington Parkway is within the jurisdiction of, and policed by, the United States Park Police.

that he was neither intoxicated nor using drugs. Though Officer Ramos smelled no alcohol on Hardison's breath, he requested that Hardison perform field sobriety tests. Hardison was virtually incapable of performing these tests.

As Officer Ramos was attempting to administer the field tests to Hardison, Officer Joe Cox, also of the United States Park Police, arrived on the scene. Officer Cox noted that Hardison had no motor skills. He asked Hardison to breathe into his face. Hardison did so and Cox smelled an ether-like odor. Officer Ramos then informed Hardison that he would transport him to a location off the Parkway where he could make arrangements for a ride home. Officer Cox asked Morris if she could drive the truck. She responded that she was unable to operate a standard transmission. Meanwhile, Hardison indicated that he would rather drive his truck than to be transported by the police. Officer Ramos then decided he would transport Hardison to the police substation and make arrangements for him there. He so informed Hardison and attempted to pat him down.

Up to this point, Officer Ramos had no intention of arresting Hardison. Because he never saw Hardison actually operating the Toyota, he believed he lacked the requisite probable cause to arrest him for operating under the influence. Officer Ramos' purpose was simply to make sure that Hardison did not get behind the wheel of the Toyota in his impaired condition. He executed the pat-down search of Hardison as a safety precaution before putting him in his cruiser.

During the course of the pat-down, Officer Ramos found a small pocketknife in Hardison's pants pocket. This discovery apparently unsettled Hardison, who began to physically resist the pat-down. Officer Cox assisted Officer Ramos in subduing and handcuffing Hardison and, when Hardison refused voluntarily to get into Officer Ramos' cruiser, in bodily placing him in there. At this point, according to Officer

Ramos, Hardison had formally been placed under arrest. Officer Ramos could not say, however, what crime he intended to charge Hardison with and no *Miranda* warnings were given at this time.

After placing Hardison in Officer Ramos' cruiser, Officer Cox approached Morris and informed her that he would be transporting her in his vehicle. Up to this point, Morris had been cooperative and coherent. Officer Cox suspected no criminal activity on her part. He then informed Morris that he would have to search her purse before transporting her. Her gestures—including pulling away and drawing back her purse—indicated unambiguously that she did not want her purse searched. Officer Cox nevertheless took the purse from her, felt a hard object inside it, and opened it up. Lying on the bottom of the purse was a starter pistol in a holster. Officer Cox, believing the pistol to be a functioning firearm,[2] yelled to Officer Ramos that Morris had a gun and then placed her under arrest, handcuffed her, and put her in the cruiser. The two police officers then began searching the Toyota for evidence. They discovered another starter pistol and a pair of handcuffs under the driver's side floormat. In the open bed of the truck on the driver's side they found baggies and parsley flakes.[3] In the bed on the passenger's side they found a mason jar inside a rubber boot. The mason jar was subsequently determined to contain PCP.

After transporting the two suspects to the substation, the officers thoroughly searched Morris' pocketbook. In it, they found a McCormick's spice box with a bottle containing liquid inside. Subsequent testing confirmed that the liquid was PCP.

At the conclusion of the suppression hearing, the Magistrate concluded that the initial search of Morris' purse on the highway was unlawful. The Magistrate reasoned that Officer Cox had no reason to suspect Morris of any criminal activity or possession of any weapons, and that while

---

**2.** In fact, this starter pistol, as well as the one found later in the truck, was, its appearances notwithstanding, not an operable firearm.

**3.** Parsley flakes are apparently a common medium for the smoking of PCP.

the search might have been a reasonable precaution before transporting her in his cruiser, there were less intrusive ways of getting Morris to a place of safety short of compelling her to ride in the cruiser and submit to a search of her personal belongings. The Magistrate therefore suppressed the starter pistol. As for the PCP that was found in Morris' purse in the post-arrest, stationhouse search, the Magistrate concluded that this evidence was admissible because it would have been discovered anyway. He reasoned that the arrest of Hardison entitled the officers to search the Toyota truck. This search having uncovered PCP, the Magistrate further reasoned that Morris would have been arrested anyway on a joint possession theory and the search of her pocketbook would have ensued incident to her arrest on that charge.

On appeal to this Court, Morris contends that the Magistrate erred in concluding that the PCP found in her purse was not the fruit of the initial unlawful search of her pocketbook. She argues that neither she nor Hardison had been arrested prior to the initial illegal search of her purse. Thus, she concludes, there were no grounds for the search of the Toyota until Officer Cox had discovered the starter pistol. Morris argues that the idea that the officers would have searched the Toyota in the absence of the illegal search is impermissible speculation. She further argues that even if the officers had searched the Toyota and found the PCP in the bed, there is nothing to support the conclusion that she, as a mere passenger who was coherent and cooperative, would inevitably have been charged with possession of the drug and been, as a consequence, subjected to a search of her belongings.

For its part, the government contends that because Officers Ramos and Cox, even in the absence of the search of Morris' purse, would have conducted a search of the Toyota incident to Hardison's arrest, see New York v. Belton, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981) (when a police officer has made a lawful custodial arrest of the occupant of an automobile, he may search the passenger compartment of that automobile), there was an independent source for the stationhouse search of Morris' purse.

While the government's argument is theoretically sound, it is not supported by the evidentiary record. It can be assumed that the officers could have searched the Toyota incident to the arrest of Hardison. But there is simply nothing in their testimony to support a finding that they would have or intended to search the vehicle before the pistol was discovered in Morris' purse through Officer Cox's initial unconstitutional search. To the contrary, there is sufficient testimony to support a conclusion that if Morris had been able to operate a stick shift she would have been allowed to drive away in the Toyota, even after her companion had been arrested. To be sure, Officer Cox did testify, in response to a question posed to him by the government on redirect examination, that he searches a vehicle every time its occupants are arrested. But that answer was clearly a generalization. When Officer Cox focused his attention on the specific incident in question, his testimony indicated that the Toyota would not have been searched without the discovery of the starter pistol in Morris' purse. On direct examination, he said that after Hardison's arrest he advised Morris that he would transport her off the highway since she could not drive the Toyota and it was illegal for pedestrians to be on the Parkway. On cross-examination by Hardison's attorney, Officer Cox strongly suggested that the Toyota was searched as a direct consequence of the discovery of the gun in Morris' purse. Furthermore, Officer Ramos testified that he arrested Hardison only after he resisted the patdown search. Yet Officer Ramos was unclear about what he intended to charge Hardison with, and suggested that his intention up until the discovery of Morris' pistol was simply to make sure that Hardison did not get behind the wheel of the Toyota. Though the physical restraint of Hardison amounted to an arrest, the lack of an intent by the arresting officer to charge him with a crime tends to confine the proposition that the Toyota would have been searched in the absence of the search

of Morris' purse to the realm of mere speculation.

Where courts have applied the independent source doctrine to admit evidence arguably tainted by unlawful police conduct, there has been a showing that the evidence was in fact obtained through an independent source and not through exploitation of the unconstitutional behavior. In *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), for example, the evidence that the defendants sought to have suppressed was uncovered during the search of their apartment conducted pursuant to a warrant issued on probable cause derived wholly independently of a putatively unlawful search and seizure of the premises. *See also United States v. Palumbo*, 742 F.2d 656, 661 (1st Cir.1984) (valid search warrant based entirely on probable cause learned prior to original, putatively unlawful, entry of defendant's premises), *cert. denied*, 469 U.S. 1114, 105 S.Ct. 799, 83 L.Ed.2d 792 (1985). Courts have emphasized the necessity of a showing that the evidence *would* have been uncovered independently; not merely that it *could* have been. *See id.* at 660; *United States v. Finucan*, 708 F.2d 838, 843 (1st Cir.1983); *United States v. Alvarez–Porras*, 643 F.2d 54, 63–64 (2d Cir.), *cert. denied*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981).

In addition to the independent source rule, the Supreme Court has recognized a related doctrine, the inevitable discovery exception to the exclusionary rule, under which the government must prove that tainted evidence would have been obtained inevitably regardless of any overreaching by the police. *Nix v. Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 2510, 81 L.Ed.2d 377 (1984). As with the independent source rule, the inevitable discovery doctrine requires proof that the evidence *would* have been inevitably discovered. The Court in *Nix* pointed out that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment...." *Id.* at 444–45 n. 5, 104 S.Ct. at 2509 n. 5.

There is simply not enough evidence on the record in this case to sustain a determination that the PCP found in Morris' purse would have been discovered inevitably or through an independent source. This Court holds that that evidence should have been suppressed as the fruit of the initial unlawful search. Accordingly, it is this 8th day of April, 1988, by the United States District Court for the District of Maryland,

ORDERED:

(1) that the Magistrate's verdict of guilty as to Morris' possession of PCP be, and the same hereby is, *Vacated;*

(2) that this case be, and the same hereby is, *Remanded* to the Magistrate for proceedings not inconsistent with this Opinion; and

(3) that the Clerk of the Court shall mail a copy of this Memorandum and Order to the parties.