Argued and submitted November 30, 1978, affirmed November 5,
reconsideration denied December 13,
petition for review allowed December 27, 1979

**STATE OF OREGON,**
*Respondent,*

*v.*

**DONNA LORAINE TOURTILLOTT,**
*Appellant.*

(No. 10158, CA 10998)

602 P2d 659

James E. Mountain, Jr., Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Karen H. Green, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Johnson,* Gillette and Roberts, Judges.

SCHWAB, C. J.

---

*Johnson, J., resigned December 18, 1978.

**SCHWAB, C. J.**

While driving on a rural road, defendant was stopped by an officer attempting to detect possible game violations the first weekend of hunting season. The officer asked to see defendant's driver's license, which she was unable to produce. Defendant was subsequently convicted of driving while suspended and appeals, contending the stop of her vehicle was illegal.

Defendant acknowledges that under *Delaware v. Prouse*, 440 US 648, 99 S Ct 1391, 59 L Ed 2d 660 (1979), roadblock-type stops of motorists are constitutionally permissible, but argues the stop in this case was not in the nature of a roadblock. Defendant's argument necessarily raises the issue we recently noted but did not resolve in *State v. Odam*, 40 Or App 551, 595 P2d 1277, *aff'd* 290 Or 160, 619 P2d 647 (1979)—whether Oregon statutes permit roadblock stops to detect game violations. Finally, defendant contends that if the rationale for the stop was to detect game violations, the stop became impermissibly intrusive when the officer asked to see her driver's license.

We conclude that, as a factual matter, defendant was stopped at a roadblock; that Oregon statutes do not prohibit roadblock stops to detect game violations; and that a motorist stopped for any valid reason may be asked to display his or her driver's license. We therefore affirm.

I

The United States Supreme Court has defined and contrasted impermissible roving-patrol or random spot-check stops, on the one hand, with permissible roadblock or checkpoint stops, on the other hand, in *United States v. Martinez-Fuerte*, 428 US 543, 96 S Ct 3074, 49 L Ed 2d 1116 (1976), and *Delaware v. Prouse, supra.* Roving-patrol or random spot-check stops involve an officer's singling out an individual motorist to stop based solely on the officer's "standardless," "unbridled" and "unreviewable" discretion. *Delaware v.*

[7]

*Prouse, supra*, 59 L Ed 2d at 672 and 674; *Martinez-Fuerte*, 49 L Ed 2d at 1129. By contrast, the usual motorist is advised he is approaching a roadblock or checkpoint stop by signs and/or stationary, marked police vehicles with flashing lights and/or a uniformed officer standing on the highway. *Martinez-Fuerte*, 49 L Ed 2d at 1121. Vehicles can be slowed at a roadblock or checkpoint while officers make a visual inspection of the vehicles and occupants, or brought to a complete halt and the occupants briefly questioned. *Martinez-Fuerte*, 49 L Ed 2d at 1121-22 and 1128.

The "crucial distinction," *Delaware v. Prouse, supra*, 59 L Ed 2d at 669, is the likely subjective impact upon motorists. " * * * [T]he subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop" than in the case of a spot-check stop. *Martinez-Fuerte*, 49 L Ed 2d at 1116, quoted in *Delaware v. Prouse, supra*, 59 L Ed 2d at 669. "At traffic checkpoints, the motorist can see that other vehicles are being stopped, he can see visible signs of the officer's authority and he is much less likely to be frightened or annoyed by the intrusion." *United States v. Ortiz*, 422 US 891, 894-95, 95 S Ct 2585, 45 L Ed 2d 623 (1975), quoted in *Martinez-Fuerte*, 49 L Ed 2d at 1116, and quoted in *Delaware v. Prouse, supra*, 59 L Ed 2d at 670.

We previously applied the distinction between roving-patrol, spot-check stops and roadblock stops in *State v. Odam, supra.* In *Odam* a game officer patroling a rural area intended to stop every motor vehicle he encountered to investigate possible game violations. Despite the officer's intent not to be selective, the subjective impact upon any given motorist stopped would be the same as if the officer were selective. We concluded the stop in *Odam* was not of the roadblock type.

We conclude the stop in this case was of the roadblock type. The officers had set up a sign on the

[8]

highway that said something to the effect of "attention hunters" and "all vehicles must stop." A police car was parked along the road at an angle so that approaching motorists could see the official insignia on the side. An officer wearing a uniform and badge was standing in the middle of the highway holding up his hand to signal cars to stop.

Defendant makes much of the stopping officer's testimony that, if a car just slows down and contains older people or "it doesn't appear that they have been hunting or anything, we just normally let them continue on as long as we don't see anything obviously wrong." Defendant contends this amounts to stopping some vehicles and not others based solely on the officer's unbridled discretion. On the contrary, we find the practice of requiring traffic to slow without literally stopping followed by literally stopping some but not all vehicles for further inquiry to be fully consistent with the checkpoint operations approved by the Supreme Court in *Martinez-Fuerte.*

## II

Two Oregon statutes may limit the constitutional authority to make roadblock-type stops to investigate possible game violations. ORS 496.660(1) applies specifically to enforcement of game laws:

> "Any person mentioned in ORS 496.645 [game officers] may search any person, and examine any boat, automobile, aircraft, conveyance, vehicle * * * which they have reason to believe contain evidence of violations of the wildlife laws."

ORS 131.615(1) is general in nature:

> "A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry."

Although ORS 496.660(1) speaks only to warrantless searches, in *Odam* we held: "The statutory authority to search a vehicle is inseparable from the

[9]

authority to stop the vehicle for purposes of a search." 40 Or App at 555. The effect of that holding is to make ORS 496.660(1) and 131.615(1) substantially synonymous for present purposes: a vehicle can be stopped based upon "reasonable suspicion" or "reason to believe" it contains evidence of violations of the wildlife laws.

But there remain two possible interpretations of these statutes. First, the legislature could have intended to outlaw roadblock stops of motor vehicles, leaving the statutory standards the sole possible basis for stops of vehicles to enforce wildlife laws. Second, the legislature could have intended the statutory standards to apply only to what we have above called roving-patrol and spot-check stops; and not have intended any statutory limitation on roadblock or checkpoint stops.

We find nothing in the language of the statutes or available history that points toward one interpretation or the other. What we do find is a long-standing practice of using checkpoints to enforce the game laws. As the trial court observed in denying defendant's motion to suppress:

> "This is just a routine game checkpoint. They have them every year in this area * * *."

We think it safe to assume that members of the legislature and circuit judges have the same opportunity to learn of annual events. So the argument that ORS 496.660(1) and 131.615(1) prohibit game checkpoints runs into the reality that at least some members of the legislature must have been aware that the statutes have not had that effect, but the legislature has done nothing to clarify its intent. Under these circumstances, we conclude it more likely that the legislature did not intend ORS 496.660(1) or 131.615(1) to prohibit game checkpoints.

### III

Finally, defendant contends that even if the stop of the vehicle she was driving at the game checkpoint

was valid, the officer's request to see her driver's license was impermissible. Defendant argues the officer would have been entitled to ask to see a hunter's license, but was not entitled to ask to see a driver's license.

A stop that is lawful at the outset can become unlawful if detention and inquiry becomes overly intrusive. *State v. Carter/Dawson*, 34 Or App 21, 578 P2d 790 (1978), *modified on other grounds*, 287 Or 479, 600 P2d 873 (1979). For example, in *Carter/Dawson* a lawful stop of a motorist became overly intrusive when the officer began asking questions unrelated to the traffic reason for the stop.

*Carter/Dawson* does not necessarily require or support the conclusion that the intrusiveness of a stop is always a question of fact to be resolved on a case-by-case basis. In *State v. Brister*, 34 Or App 575, 579 P2d 863, *rev den* 284 Or 521 (1978), officers had stopped a motorist for lack of license plates. Before speaking to the driver the officers saw a valid temporary registration certificate inside the windshield. We nevertheless upheld the right of the officers to subsequently ask to see the driver's license. Applying *Brister*, we conclude that a motorist stopped for any valid reason— including at a game checkpoint—may be asked to display his or her driver's license, and that as a matter of law such a request does not make any stop overly intrusive.

Affirmed.