**STATE of Utah, Plaintiff and Respondent,**

v.

**Larry ELLIOTT and Carl Howe, Defendants and Appellants.**

**No. 17103.**

Supreme Court of Utah.

Feb. 5, 1981.

* WILKINS, J., concurred in the opinion prior to his resignation.

** CROCKETT, J., acted on this case prior to his retirement.

Thomas H. Means, Provo, for defendants and appellants.

Robert B. Hansen, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

HALL, Justice:

Defendants appeal their convictions of theft of a motor vehicle, in violation of U.C.A., 1953, 76–6–404 and 76–6–412.

On Sunday, March 16, 1980, defendants entered a service station in Green River, Utah. They were driving a red pickup truck with a camper shell on the back which contained numerous tires, rims, automobile parts, and tools. They approached the station attendant about selling some of the items so that they could purchase gasoline. The attendant indicated that he was not interested, but a customer at the station did purchase a tire, a rim and a tachometer, all for $10. Yet another customer thought the circumstances of the transaction to be rather suspicious, and an explanation of what had occurred at the service station was relayed to Officer Steve Rapich of the Utah Highway Patrol.[1] Officer Rapich stopped at the station to confirm the information he had received and asked his dispatcher to run a computer check on the California license plates reportedly displayed on the vehicle.[2] The dispatcher indicated that the vehicle registered to the California plates had not been reported stolen. Nevertheless, Officer Rapich decided to pursue the vehicle, suspecting that the auto parts and tires may have been stolen goods.

Officer Rapich first located defendants some 16 miles east of Green River, headed east on the four-lane interstate highway. He pulled up directly behind the truck and turned on his red spotlight. When defendants did not pull over,[3] the officer pulled alongside the truck and shined the spotlight directly at the driver.[4] When he still didn't get a response, he sounded his siren twice and motioned them to the side of the road. Defendants finally acknowledged the offi-

---

1. The customer told one Ritchie, the father of the city marshal, who told one Weber, an off-duty police officer, who radioed Officer Rapich.

2. Rapich testified at trial that he had once recovered a stolen vehicle under a similar set of circumstances.

3. The officer testified that he was not particularly surprised that they didn't stop immediately inasmuch as "the rear view mirrors [on the truck] were marginally adequate to have seen my vehicle right behind them."

4. About this time, Officer Rapich noticed on the truck's windshield a Utah Safety Inspection sticker which had been partially scraped off.

cer's presence, but refused to stop. Officer Rapich thereupon fell back behind the truck and radioed for assistance.

Defendants proceeded a few miles and then turned off the interstate onto a dirt road, where they attempted to elude Officer Rapich. As they sped along the dirt road, the camper door came open and various items contained in the camper (fishing poles, tires, bedding, etc.) were scattered along the way. The camper itself eventually became dislodged from the truck and landed on its top on the side of the road. Rapich continued to follow defendants to the end of the dirt road, where he apprehended them as they ran from the truck. Other officers arrived shortly thereafter and secured the vehicle.

It was later discovered that the vehicle belonged to one John Schouten of Provo, who had reported that his vehicle had been stolen sometime between 5:30 p. m. on March 15 and 11:30 a. m. on March 16. Schouten testified that Officer Rapich notified him on the evening of March 16 that his vehicle had been recovered. On March 17, Schouten and his wife drove to Moab to claim the truck. Schouten testified that on picking up the truck he noticed that the key switch had been taken out and the ignition wires were hanging below the dashboard, and that the locking gas cap had been broken.

Defendants were charged with the theft of the Schouten vehicle. They moved to suppress all evidence on the basis that they were illegally stopped and arrested without probable cause. The motion was denied after a hearing on April 30, 1980. Defendants waived a jury trial and were convicted

by the court on May 15, 1980. Subsequently, both were sentenced to an indeterminate term of 1–15 years in prison.[5]

On appeal, defendants claim that the officer's attempt to stop them was not based on a reasonable suspicion and was therefore unlawful under the Fourth Amendment to the United States Constitution.[6] The general rule for "stop and frisk" cases was first stated by the United States Supreme Court (hereinafter "Supreme Court") in *Terry v. Ohio*.[7] *Terry* held as follows:

... there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." And in justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.... Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.[8] [Citations omitted.]

The Supreme Court refined this holding in *Adams v. Williams*,[9] as follows:

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.... A brief stop of a suspicious individual, in or to determine his identity

5. Defendant Howe's sentence was suspended and he was placed on probation for two years.

6. Compare provisions of the Utah Constitution, Art. I, § 14.

7. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

8. Id., at 21, 22, 88 S.Ct. at 1879–80. We recently quoted this language from *Terry* in *State v. Whittenback*, Utah, 621 P.2d 103 (1980). In that case, a police officer, patrolling an area where there had recently been several thefts, stopped the defendants who were alone in a

laundromat. The officer recognized the defendants from a previous encounter when they had been in possession of contraband and a bag of coins. The officer entered the laundromat and asked the defendants what they were doing and for identification. This Court held the stop to be proper because these facts gave the officer objective, credible reasons sufficient to meet the *Terry* standard.

9. 407 U.S. 143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1972).

or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. [Citations omitted.]

In *United States v. Brignoni-Ponce*,[10] the Supreme Court applied the principles set forth in *Terry* and *Adams* to investigatory stops of motor vehicles. In that case, it was held that for a stop of an automobile to be reasonable it must be based on specific objective facts which tend to indicate that particular individual has been involved in criminal activity. The Supreme Court also recognized that a police officer's experience is a relevant factor to consider in determining whether there was a reasonable suspicion to justify a stop.

The most recent ruling of the Supreme Court on the topic is *Brown v. Texas*.[11] In *Brown*, the defendant was stopped and asked to identify himself when he was observed in an alley in an area with a high incidence of drug traffic. To explain the stop, the officer could only say that the defendant "looked suspicious and we had never seen that subject in the area before." They could not point to any facts or circumstances that would distinguish the defendant from any other pedestrian in the neighborhood. In reversing the conviction, the Supreme Court held that the stop was violative of the Fourth Amendment due to the absence of any articulable reason to stop the defendant (other than to merely ascertain his identity).

■ In the instant case, we believe that there are sufficient articulable facts and inferences which justify the action of Officer Rapich. It was only after several other persons became concerned about the circumstances at the service station that the officer even became involved. Rapich learned that two persons, driving a vehicle with out-of-state plates, were trying to sell tires and auto parts at drastically reduced

prices in order to purchase gasoline on a Sunday afternoon. The officer had personal knowledge that such activity may signal impropriety, he having previously recovered a stolen vehicle under similar circumstances. A computer check revealed that the vehicle registered and entitled to display the California plates had not been reported stolen. Notwithstanding the negative report on the license plates, Officer Rapich still suspected that defendants were involved in criminal activity. At the hearing on defendants' motion to suppress the evidence, he testified as follows:

I stopped them simply to question them in regards to the auto parts and tools that they were trying to sell in Green River. It wouldn't have been the first time that I recovered a stolen vehicle as a result of that sort of behavior on the part of the drivers. It was simply to stop them and question them as to where they got the auto parts and why they were trying to sell them, ask for the driver's license and registration of the vehicle.

\* \* \* \* \* \*

... At that time I didn't suspect an auto theft situation. I was curious in regards to possibly stolen parts. A person I didn't think normally carries his camper full of tires and rims and sells them for gas as you go along the country. It didn't seem to me to be 100 per cent typical behavior of a truck and camper. I just wanted to stop and ask them about it.

Based on these facts and inferences, the officer acted appropriately in attempting to stop defendant.[12]

■ Defendants also claim that their arrests were made in the absence of probable cause and hence, that the fruits thereof should have been suppressed. The record does not disclose the specific reason for the arrest, but there was probable cause to arrest defendants under either of the following statutory provisions:

10. 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

11. 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

12. See *State v. Whittenback*, supra, footnote 8, and cases cited therein.

A peace officer may, without a warrant, arrest a person:

(1) For a public offense committed in his presence.

\* \* \* \* \* \*

(3) When he has reasonable cause for believing the person to have committed a public offense, although not in his presence, and there is reasonable cause for believing that such person before a warrant can be obtained and served may:

(a) Flee the jurisdiction or conceal himself to avoid arrest, or

(b) Destroy or conceal evidence of the commission of the offense, or

(c) Injure another person or damage property belonging to another person.[13]

Under subsection (1), Officer Rapich clearly could have arrested defendants for various public offenses committed in his presence including: reckless driving,[14] littering,[15] and failure properly to display a safety inspection sticker.[16] Inasmuch as a reasonable basis existed for the attempted stop, defendants could also have been arrested for failure to stop at the officer's signal.[17]

■ This latter point (the flight of defendants) also tends to validate the arrest under subsection (3). It is true that flight in the abstract is not sufficient to constitute probable cause for arrest.[18] However, when flight is coupled with a reasonable belief that the suspect is involved in criminal activity, there exists probable cause for arrest.

In the case of *Sibron v. New York*,[19] an officer heard some strange noises outside his apartment and suspected that someone was trying to break in. On investigating the noise, he saw two men tiptoeing down the hall. The officer went out into the hall to question them and the men fled. Because the officer had first come to the reasonable conclusion that a crime may have been in progress, the fact that the suspects fled was strong evidence of their guilt and was sufficient to establish probable cause for arrest. The Supreme Court held as follows:

It is difficult to conceive of stronger grounds for an arrest, short of actual eyewitness observation of criminal activity ... deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to arrest.[20] [Citations omitted.]

In *State v. Eastmond*,[21] this Court interpreted subsection (3) as follows:

In performing his duties as authorized by this statute, a police officer is not required to meet any such standard of perfection as to demand an absolutely certain judgment before he may act. The test to be applied is one which is reasonable and practical under the circumstances: whether a reasonable and prudent man in his position would be justified in believing facts which would warrant making the arrest. In ruling on the admissibility of evidence so obtained, the questions as to the validity of the arrest and the justification for any search made in connection therewith are primarily for the trial court to determine; and on appeal we respect that prerogative and do not upset his determination unless it clearly appears that he was in error. [Citations omitted.]

13. U.C.A., 1953, 77–13–3.

14. In violation of U.C.A., 1953, 41–6–45.

15. In violation of U.C.A., 1953, 41–6–114 and 41–6–114.1.

16. In violation of U.C.A., 1953, 41–6–158(c) and 41–6–164.

17. In violation of U.C.A., 1953, 41–6–13.5.

18. See *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

19. 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

20. Id., at 66, 67, 88 S.Ct. at 1904.

21. 28 Utah 2d 129, 499 P.2d 276 (1972).

On the circumstances presented, we are convinced that Officer Rapich acted reasonably and prudently in arresting defendants. Evidence seized subsequent to the arrest during the inventory of the vehicle was therefore properly admitted at trial.

Affirmed.

MAUGHAN, C. J., and STEWART, HOWE and OAKS, JJ., concur.