677 P.2d 522

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Lee COOK, Defendant-Appellant.**

No. 13876.

Court of Appeals of Idaho.

Feb. 8, 1984.

Klaus Wiebe, Ada County Public Defender, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Mark J. Shuster, Deputy Atty. Gen., Boise, for plaintiff-respondent.

SWANSTROM, Judge.

Minutes after the robbery of a Circle K store in Boise, Lee Cook and a companion were apprehended by several Boise police officers. The officers searched Cook and found a wad of money in his pocket. They also found a loaded .22 caliber revolver in his car. Cook was convicted of the robbery and sentenced to an indeterminate twenty-year prison term. He has appealed from the judgment of conviction. We affirm.

Three issues are raised on appeal: (1) whether the district court erred in refusing to suppress the wad of money seized from Cook; (2) whether the court erred in admitting evidence that the gun found in Cook's car had been stolen; and (3) whether the conviction must be reversed because the state made indirect references to Cook's prior felony conviction after the court had ruled that such evidence was not admissible.

On the evening of August 31, 1979, Detective Charles French was parked in an unmarked vehicle near a NuWay Foods store in Boise when he observed a man walking from the direction of that store. The man passed within a few feet of the officer. He was wearing a stocking cap and a leather jacket with a fleece-type lining. This person, later identified as Lee Cook, got into the passenger side of a yellow Toyota sedan. That car was not parked in the store lot, but on the street about three-quarters of a block from the store. These observations piqued the officer's interest, partly because the cap and jacket worn by the man appeared inappropriate for such warm weather.

French decided to pursue the car. He followed it for some time, but, not wanting to alert the occupants, he broke off contact. After driving a block or so, he turned around and sought to re-establish contact with the car. Unable to find it, he returned to the area near the grocery store where he found two uniformed officers, Schuler and Marcum. He told them what he had seen.

Schuler, in an attempt to locate the car, drove toward the area where it had last been seen. While en route, he heard a radio transmission stating that a robbery had just occurred at a Circle K store only two blocks from where French had lost sight of Cook's car. None of the officers who testified at trial were able to recall exactly what was said in that transmission. Apparently the only information relayed initially was that a robbery had occurred. No description of the robber or his car was given because no officer had yet talked with the witnesses at the scene.

After hearing of the robbery, Schuler and Marcum transmitted the information they had received from French. Soon afterwards Officer Virgil Brown observed a yellow Toyota sedan and began to follow it. Officers Likes and Ellsworth, in another police car parked nearby, also noticed the suspects' car. Ellsworth saw the car stop at a corner to pick up a young female hitchhiker. Ellsworth and Likes, together with another officer, then joined Brown in pursuit. The officers in all three police cars activated their overhead lights in an attempt to stop the Toyota. When it did not stop, Brown turned on his siren. The Toyota proceeded several hundred yards further, then turned a corner before stopping. At no time did it speed or attempt to escape the pursuing police cars.

When the Toyota finally stopped, Cook emerged from the passenger side and began to walk away slowly. He was not wearing either his coat or stocking cap at this time. Several officers, with drawn weapons, warned Cook to stop. Ellsworth ordered him to put his hands on his head and walk back towards his car. When Cook complied, Ellsworth noticed a green ski mask hanging out of his left rear pants pocket. He seized the mask and reached into Cook's right front pants pocket, extracting a wad of crumpled paper money.

Cook was then handcuffed and placed in a police car.

Just before arriving at the Circle K, Officer Schuler heard a transmission from Officer Brown that he and others had stopped the car described by French. After talking for several minutes with the witnesses to the robbery, Schuler transmitted a description of the robber to the officers who had stopped the car. The robber had worn a ski mask and a coat with a fleece-type lining, and was missing some fingers. Cook was missing fingers on his right hand. This last transmission occurred *after* Cook had been arrested.

Following Cook's arrest, Ellsworth approached the Toyota from the passenger side. The front door was open and Ellsworth noticed a brown leather coat hanging over the gear shift. On the floorboard directly behind the passenger seat, he observed a .22 caliber revolver. Ellsworth picked up the gun, examined it and returned it to the floor of the car. The officers impounded the car and later obtained a warrant to search it. The gun, coat, money and ski mask, as well as other items, were introduced into evidence against Cook at his trial. Cook moved to suppress all of this evidence. The district court denied the motion. On appeal, Cook contends only that the money was illegally seized and admitted into evidence.

### I *

The first issue is whether the district court erred by refusing to suppress the wad of money seized from Cook's pocket immediately following his apprehension by the officers. At trial, to account for the money found in his pocket, Cook testified that he had been paid several days before his arrest. He said that he never bothered with checking accounts and always kept his money in cash. Cook's present wife, Clista, testified that before he went out that evening she cautioned him not to blow all

his money.[1] He responded by pulling a wad of money out of his pocket and counting out nearly $300. When Cook was searched later that night, however, the officers found only $86 in his pocket. The manager of the Circle K testified that $79 had been taken in the robbery.

The fourth amendment of the United States Constitution and article I, § 17 of the Idaho Constitution protect people from unreasonable searches and seizures by the agents of the government. At the time of this search, the officers did not have a warrant to search either Cook or his car. Warrantless searches are deemed to be "per se unreasonable" and the burden is upon the state to demonstrate that the search was carried out pursuant to one of the exceptions to the warrant requirement. *State v. Bottelson*, 102 Idaho 90, 625 P.2d 1093 (1981).

Cook concedes, and it is clear from the facts of the case, that the officers had the right to stop his car without a warrant and question him and his companion concerning their possible involvement in the robbery. Such an investigative stop is an "intermediate response" that allows an officer, who lacks probable cause to make an arrest, to actively investigate possible criminal behavior. As the Supreme Court stated in *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972):

> A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be ... reasonable [under the fourth amendment] in light of the facts known to the officer at the time.

Moreover, if an officer who makes such an investigatory stop "has reason to believe that the suspect is armed and presently dangerous, the officer is entitled to 'conduct a carefully limited search

---

* The views expressed in Part I of the opinion, concerning the validity of the search and the doctrine of inevitable discovery, are those of the author. The views of the other members of the

court on these points are set forth in the separate opinion by Judge Burnett, *post.*

1. *Clista and Lee Cook were not married until after the date of the robbery.*

of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.'" *State v. Post,* 98 Idaho 834, 838, 573 P.2d 153, 157 (1978) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence...." *Adams v. Williams,* 407 U.S. at 146, 92 S.Ct. at 1923. No evidence was presented here that the searching officer believed the wad of money in Cook's pants pocket felt like a weapon. No such contention has been made. Therefore, when the officers stopped Cook and removed the money from his pocket, they conducted a search which went beyond the permitted scope of a frisk for weapons.

■ Another of the established exceptions to the warrant requirement is the search incident to a lawful arrest. *State v. Post,* 98 Idaho 834, 573 P.2d 153 (1978); *State v. Harwood,* 94 Idaho 615, 495 P.2d 160 (1972); *State v. Loyd,* 92 Idaho 20, 435 P.2d 797 (1967). The state contends that the search of Cook and the seizure of the money were permissible as a search and seizure incident to a lawful arrest. Cook, on the other hand, argues that at the moment the officers searched him and seized the money they lacked probable cause to arrest him. Thus, he argues, the search cannot be considered a search incident to a lawful arrest and its fruit must be suppressed as the product of an illegal, warrantless intrusion.

Idaho Code § 19–603 provides that a police officer may arrest a person without a warrant "[w]hen a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it." The Idaho Supreme Court has defined reasonable or probable cause in the context of I.C. § 19–603 "as information that 'would lead a man of ordinary care and prudence to believe or entertain an honest and strong suspicion'" that the subject of arrest is guilty. *State v. Alger,* 100 Idaho 675, 677, 603 P.2d 1009, 1011 (1979).

Similarly, whether a warrantless arrest is constitutionally permissible depends upon whether

> at the moment the arrest was made, the officers had probable cause to make it— whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.

*Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Furthermore,

> [i]n dealing with probable cause ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Brinegar v. U.S.,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).

■ The exact timing of the events surrounding Cook's arrest is uncertain, but Cook may not have been formally arrested until he was handcuffed and led away to a police car—*after* the officers had already searched his pockets. If, however, the officers had probable cause to arrest Cook at the time they conducted the search, the fact that the search preceded his formal arrest by several minutes would not necessarily render the search illegal. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

The author of this opinion cannot, however, conclude that at the moment the officers searched Cook they had probable cause to arrest him. When they stopped him they knew only that a felony had been committed and that he had been in the vicinity of the Circle K store shortly before the robbery. They knew nothing about the identity of the robber. The radio transmission which announced that the robbery had occurred did not provide any description of the robber or any clue as to his means of flight. Not until Schuler went on the radio and transmitted the information he had received from the witnesses to the robbery

did the arresting officers have any description of the robber. However, before Schuler had a chance to transmit this information, the officers had already stopped the Toyota, and searched and arrested Cook. They believed Cook to be the robber, not on the basis of any description provided by the witnesses to the crime, but simply on the basis of the information provided by French, i.e., that Cook had been engaged in suspicious behavior at another store and had been seen within one to two blocks of the Circle K store prior to the robbery. Moreover, when Ellsworth searched Cook he had not yet discovered the weapon on the floor behind the passenger seat in Cook's car. "The cases recognizing the 'probable cause' exception to the warrant requirement have always insisted that *the officers conducting the search* have 'reasonable or probable cause' to believe that they will find the instrumentality of a crime or evidence pertaining to a crime as a prerequisite to dispensing with a warrant." 68 Am.Jur.2d SEARCHES AND SEIZURES § 42 (1973) (emphasis added).

Nevertheless the money seized need not necessarily be suppressed.

> In asking whether the evidence falls within the general exclusionary bar against use of the fruits of an unlawful search, our inquiry must focus on whether the testimony " 'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " ... Whether evidence is sufficiently distinguishable hinges on the application of three closely related exceptions to the exclusionary rule. The testimony will be admissible if it derives from an independent source, ... or if it has an attenuated link to the illegally secured evidence, ... or if it inevitably would have been discovered during police investigation without the aid of the illegally obtained evidence, .... [Citations omitted.]

*United States v. Miller,* 666 F.2d 991, 995 (5th Cir.1982), *cert. denied,* 456 U.S. 964, 102 S.Ct. 2043, 72 L.Ed.2d 489 (1982).

The exception pertinent to the present case is the third, the so-called "inevitable discovery" doctrine. Under this doctrine, if it is *certain* that the evidence seized illegally would have otherwise been discovered legally, it need not be suppressed. *Crews v. United States,* 389 A.2d 277 (D.C.1978), *rev'd on other grounds,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). *Cf. United States v. Miller, supra,* (requiring only that it be "reasonably probable" that the evidence seized would have otherwise been discovered—*Miller* represents the majority view, but the stricter standard appears to better preserve the constitutional protections). "The crucial inquiry for a court evaluating an inevitable discovery claim is whether proper and predictable police investigatory procedures normally followed by the police department in question would have uncovered the evidence without the illegality." W. RINGEL, SEARCHES & SEIZURES, ARRESTS AND CONFESSIONS § 3.3(b) at 3–17 (1983).

A number of courts, both federal and state, have accepted this doctrine as an exception to the exclusionary rule. *See* Ringel § 3.3(b) at 3–16 n. 52; Annot., 43 A.L.R.3d 385, 404–06. *See also Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (recognizing the existence of the doctrine without passing on its constitutionality). It would indeed be senseless to supress evidence seized in good faith, albeit illegally, when that same evidence would have been seized legally at a later time had the illegal seizure not occurred. *United States v. Alvarez-Porras,* 643 F.2d 54 (2d Cir.1981), *cert. denied,* 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981). The author would therefore recognize the inevitable discovery doctrine as an exception to the federal and state warrant requirements.

Applying this doctrine to the facts of the present case, it is evident that the money need not be suppressed. Here, there is no indication of bad faith actions on the part of the officers. Although at the time Cook was arrested the officers did not have probable cause to arrest him, a few minutes

later a description of the robber was transmitted to them. The officers had not yet left the scene of the arrest. Certainly it is reasonable to believe that if the officers had not immediately arrested Cook they would have detained him for a few minutes until they could get a report from the robbery scene, which they knew was imminent. This they would have been entitled to do. *Adams v. Williams, supra.* The additional information transmitted by Officer Schuler supplied the necessary probable cause. Hence, after the transmission, they could have arrested Cook and undoubtedly would have done so. It is also certain that thereafter the officers would have conducted an evidentiary search incident to the arrest and would have discovered the money. The author would hold that the money inevitably would have been discovered and was therefore admissible.

Finally, it should be recognized that normally the state must establish two things before the inevitable discovery doctrine can be applied. The state must show first that "certain proper and predictable investigatory procedures would have been utilized." Second, the state must demonstrate that "those procedures would have inevitably resulted in the discovery of the evidence in question." LaCount and Girese, *The "Inevitable Discovery Rule," An Evolving Exception To The Constitutional Exclusionary Rule,* 40 ALB.L.REV. 483, 491 (1976). Although the state in the present case offered no affirmative showing of these two elements, the record amply supplies the required facts. The "predictable police procedures" were demonstrated by the prior, albeit invalid, arrest. Furthermore, that such procedures would have resulted in the discovery of the money is also demonstrated by the prior search. Under these circumstances then, the requirements of the doctrine are satisfied.

## II

■ We must next decide whether the district court erred in admitting evidence, during the state's rebuttal, that the gun found in Cook's possession had been stolen.

At trial and on appeal the state has contended that the evidence was probative of Cook's guilt because stolen weapons, being hard to trace, are frequently used in robberies. The evidence challenged here showed that the gun found in Cook's car had been stolen about a month and a half before the Circle K robbery. The prosecutor asked Cook directly if he had stolen the gun. He denied it and he denied knowing the gun was stolen. Of course, the state produced no evidence that Cook was the thief. *Compare State v. Thomas,* 94 Idaho 430, 489 P.2d 1310 (1971). The evidence also did not show that the gun had been stolen as part of a single chain of events leading up to the crime. *Compare State v. Shepherd,* 94 Idaho 227, 486 P.2d 82 (1971). Finally, the evidence was not necessary to show that Cook had access to a weapon similar to that used in the robbery. *Compare State v. Sharp,* 101 Idaho 498, 616 P.2d 1034 (1980). The only possible relevance of the evidence, in fact, lay in the unsubstantiated assertion by the state that stolen guns are hard to trace and therefore are more frequently used in robberies. Thus, even though Cook does not dispute the fact that the gun was stolen, the probative value of this evidence has not been shown.

■ The state also contends that the evidence was proper to rebut the testimony of Clista Cook that she was the owner of the weapon and to demonstrate the implausibility of her story that she had inadvertently left the gun in the car. "The permissible scope of evidence offered in rebuttal rests in the sound judicial discretion of the trial judge, and unless the record clearly shows an abuse of such discretion, the trial court's ruling thereon must be upheld." *Cargill v. Hancock,* 92 Idaho 460, 444 P.2d 421 (1968). Proper rebuttal evidence is that which explains, repels, counteracts or disproves the testimony, facts or evidence introduced by or on behalf of the adverse party. *State v. Olsen,* 103 Idaho 278, 647 P.2d 734 (1982); *State v. Gish,* 87 Idaho 341, 393 P.2d 342 (1964).

Cook's wife, Clista, testified for the defense. She said that the revolver the officers found in the car belonged to her. She said that she had obtained the weapon sometime after the 4th of July in 1979 as a gift to her from a male companion, whose last name she could not recall. Clista testified that about a week before the robbery she had gone for a drive in the desert to target shoot and had simply forgotten to remove the gun from the car. She said that Cook was not aware of its presence.

To rebut this testimony the state called two witnesses, husband and wife. They testified that the gun belonged to them and had been stolen in the middle of July 1979. Both witnesses were able to positively identify the gun, and they produced a registration form and a manufacturer's warranty showing the gun's serial number and identifying the wife as its purchaser. Cook objected to the admission of this evidence on the grounds that it was both improper rebuttal and improper evidence of prior criminal activity. The court, however, allowed the evidence to be admitted.

■ After carefully reviewing Clista Cook's testimony, we cannot say that the offered evidence was improper rebuttal evidence. It is true that proof the gun was stolen did not directly rebut Clista's story since she never claimed she bought the gun, only that it had been given to her. However, we believe the evidence tended to "counteract" Clista's story. The fact the gun was stolen tended to show why she could not identify the source of the "gift." At the least it cast doubt on Clista's candor and willingness to tell the whole truth about how she, and not Cook, came to have the gun in the car at the time of the robbery.

■ Evidence linking the defendant with other criminal conduct unrelated to the charge for which he is being tried—even when relevant—is generally excluded from the trial where the prejudicial impact outweighs its probative value. *State v. Stoddard*, 105 Idaho 533, 670 P.2d 1318 (Ct.App.1983). It can hardly be denied that the evidence here was prejudicial. How-

ever, it cannot be denied, either, that the evidence had probative value for rebuttal purposes. Clista had provided vital testimony in behalf of the defendant on critical points in the case. It was important for the jury to have information with which they could test her credibility as a witness. The disputed evidence tended to counteract and thus rebut one facet of her testimony. It may have provided the jury with a more accurate reflection of her entire story. Thus, while the evidence was prejudicial, we do not believe the district judge abused his discretion in ruling that the prejudice was outweighed by the value of the evidence for testing the credibility of Clista's testimony.

### III

On the first morning of the trial, with no jurors present, Cook successfully moved the district court to order that the state refrain from impeaching his credibility, if he testified, by inquiring into a prior felony conviction for first degree murder. Applying I.R.C.P. 43(b)(6), the district court held that this conviction was not relevant to Cook's credibility. He ruled, "I am not going to allow, one, the Prosecutor to ask, 'have you been convicted of a felony,' since this is the only felony involved. And second, I am not going to allow him to go into the first degree murder charge." Cook now argues that the state later made indirect references to his felony conviction in front of the jury. He asserts that this constituted deliberate misconduct warranting reversal of his conviction. The state contends that the alleged references were innocuous.

The first oblique suggestion of a prior felony conviction came during the defendant's case when Clista was being cross-examined. When Clista testified that she had inadvertently left the gun in the car, the state asked whether or not she was concerned that her husband might be found with a firearm in his possession. She was then asked whether she realized that it was illegal for her husband to possess firearms, to which she replied "yes."

Cook's counsel requested that the jury be excused and he then objected to the "Prosecutor advising this witness and the jury that it's illegal for Lee Cook to be in possession of a firearm." He moved for a mistrial. Defendant's counsel argued to the trial judge that the prosecutor's question to Clista was but a subtle way of "educating the jury to the fact that Lee Cook may have been a convicted felon." The prosecutor argued his right to do just that as part of his cross-examination of Clista, in spite of the judge's earlier ruling. The prosecutor further argued that it was relevant to overcome defense counsel's suggestions to the jurors during voir dire that "it's not wrong for a person to have a gun in his car." The judge conceded that "it's slightly relevant" but he cautioned "there's a great deal of prejudice to be had in this case." The judge correctly perceived the question to be one of weighing the probative value of the evidence against the possible prejudice to the defendant.

The judge denied the mistrial, stating that he believed the prosecutor's question was not prejudicial and "was rather innocuous." However, after the prosecutor persisted in arguing his right to show it was illegal for Cook to possess a firearm, the judge closed the matter by saying, "to make it clear for the record, I don't want to bring out to the jury his past criminal record, either directly or indirectly. I think this [line of questioning] could do that."

The second reference came later during the cross-examination of Cook. When Cook mentioned that he was feeling very nervous, the prosecutor asked him whether he felt as nervous as the victim had felt on the night of the robbery. Cook said that he did not know how the victim might have felt since he wasn't there, but stated that he was very nervous at that moment. Cook then said that he had never been before a jury. The prosecutor replied, "You are not telling the jury you have never been before a judge before." Cook responded, "Yes, sir. I have been before a judge before."

Cook's counsel then made, and the court sustained, an objection "to this line of questioning." As to this second incident we hold no error is shown. Nothing further occurred. No further motion for a mistrial was made and we must assume for the record that defendant was satisfied with the result produced by his objection.

The question before us on appeal is whether denial of Cook's earlier motion for a mistrial amounts to reversible error. Our method and standards for reviewing such a question are set out in *State v. Urquhart*, 105 Idaho 92, 665 P.2d 1102 (Ct.App.1983). For the purposes of focusing upon the ultimate dispositive issue, we assume—although we do not decide—that the prosecutor's line of questioning was error, because it indirectly violated the order of the trial judge to exclude evidence of Cook's prior felony conviction. However, after review of the total record, we are satisfied beyond a reasonable doubt that the same result would have been reached by the jury had the disputed evidence been excluded. *Id.* at 95, 665 P.2d at 1105. Thus we find that the error, if any, is not reversible.

We affirm the judgment of conviction.

BURNETT, Judge (with whom WALTERS, Chief Judge, joins), specially concurring.

We agree with our colleague that the judgment of conviction should be affirmed. We concur fully in Parts II and III of his lead opinion; but we concur only in the result as to Part I, which discusses the search resulting in seizure of money from Cook's pocket. In our view this search was incident to a valid arrest. Moreover, we resist the suggestion that the doctrine of "inevitable discovery" should be applied in this case. Each point is examined in turn below.

### Search Incident to Arrest

The lead opinion suggests that the search was not incident to a valid arrest because reasonable cause for such an ar-

rest did not exist when the search occurred. We disagree.

Idaho Code § 19–603 provides that a police officer may arrest a person without a warrant "[w]hen a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it." Construing this statute and its predecessors, the Idaho Supreme Court has said that reasonable cause exists when the arresting officer possesses information which would lead an ordinarily prudent and cautious officer to believe, or to entertain an honest and strong suspicion, that the person arrested has committed a felony. *E.g., State v. Polson*, 81 Idaho 147, 339 P.2d 510 (1959); *State v. Autheman*, 47 Idaho 328, 274 P. 805 (1929). In reviewing a police officer's determination of reasonable cause in the field, we have been admonished to take into account the factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act. *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

Thus, our standard of appellate review should be whether, at the time of the arrest, the police had possession of information which, viewed in light of practical considerations of everyday life, would lead an ordinarily prudent and cautious officer to believe—or to entertain an honest and strong suspicion—that appellant Cook had committed a felony. The critical variables in applying this test are the point in time when the arrest occurred and the quantum of information possessed by the police at that point. Although the state's brief suggests that information acquired after the arrest may be used to support a finding of probable cause, the overwhelming weight of authority holds that the sufficiency of information must be tested at the time of the arrest itself. *E.g., People v. Talley*, 65 Cal.2d 830, 56 Cal.Rptr. 492, 423 P.2d 564 (1967); *People v. Snelling*, 174 Colo. 397, 484 P.2d 784 (Colo.1971); *State v. Isham*, 1 Wash.App. 415, 461 P.2d 569 (1969).

The lead opinion does not specify when an arrest occurred in this case. It says only that Cook actually may have been under arrest before he was "formally" arrested, handcuffed and led away to a police car. The issue focuses upon the relationship between an investigative stop and an arrest. An investigative stop will ripen into an arrest, which must then be supported by reasonable cause, if the detention becomes overly intrusive. *People v. Tooker*, 198 Colo. 496, 601 P.2d 1388 (1979); *State v. Tourtillott*, 43 Or.App. 5, 602 P.2d 659 (1979), *aff'd* 289 Or. 845, 618 P.2d 423 (1979), *cert. denied*, 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 352 (1980). Accordingly, an arrest is deemed to have occurred, and must be tested against the requirement of reasonable cause, when the actions of the police go beyond those authorized for an investigative stop.

In this case, appellant Cook concedes that the police had adequate grounds to conduct an investigative stop. *See, e.g., State v. Clovis*, 127 Ariz. 75, 618 P.2d 245 (App.1980). When the stop occurred, Cook attempted to walk away from the scene. The police, with weapons drawn, ordered him to halt and to return. Such detention by the police officer was within the permissible scope of the investigative stop. *E.g., State v. Taras*, 19 Ariz. App. 7, 504 P.2d 548 (1972); *State v. Gardner*, 28 Wash.App. 721, 626 P.2d 56 (1981). Any investigative stop necessarily involves a brief period of detention. A suspect cannot defeat the purpose of a stop simply by walking away from it. Neither is an investigative stop necessarily converted to an arrest if the police draw weapons. The police are entitled to take reasonable precautions for their own safety and to make a reasonable show of force necessary to effectuate the stop. *See generally* 1 W. RINGEL, SEARCHES & SEIZURES, ARRESTS AND CONFESSIONS § 13.5(c) (2d ed. 1983). Here, there is no claim that the police acted unreasonably by drawing weapons to prevent an armed robbery suspect from leaving the scene.

However, when one of the police officers subsequently reached into Cook's pocket, rather than conducting a "patdown" search for weapons, the scope of a permissible investigative stop was exceeded. *State v. Post,* 98 Idaho 834, 573 P.2d 153 (1978), *overruled on other grounds, State v. Bottelson,* 102 Idaho 90, 625 P.2d 1093 (1981). *See also State v. Melear,* 630 P.2d 619 (Hawaii 1981). Therefore, in this case, the time of the arrest—for the purpose of testing the existence of reasonable cause—was coincident with the search itself.

The next question is what information the police possessed at that point. Before listing each item, it should be noted that the arresting officer's information came in part from the police radio. In such circumstances, reasonable cause must be tested upon the full information in police possession which caused the radio messages to be sent, not merely upon the messages themselves. *E.g., State v. Pokini,* 45 Haw. 295, 367 P.2d 499 (1961). *See generally* W. RINGEL, *supra,* § 4.3(d).

The police were informed of an armed robbery at the Circle K store. They also were aware that, just before the robbery, a man fitting Cook's general description had been seen walking past another store, then entering the passenger's side of a waiting automobile. Despite the warm summer weather, the man had been wearing a heavy coat and what appeared at that time to be a stocking cap. The automobile was "tailed" to a location very near the Circle K store. The same man and automobile were observed minutes later and, when stopped, the man attempted to leave the scene. When ordered to return, the man was seen to have what then appeared to be a ski mask protruding from his back pocket.

We believe these facts, considered together and viewed in light of practical considerations of everyday life, would lead an ordinarily prudent and cautious police officer to believe, or to entertain an honest and strong suspicion, that Cook had participated in the reported robbery. We acknowledge that probable cause must consist of more than mere suspicion, especially generalized suspicion. *See* cases collected in 5 AM.JUR.2d *Arrest,* § 45 (1962). However, in this case the police did not have a general suspicion; rather, they had a particularized suspicion based upon Cook's proximity to the crime, suspicious behavior and inappropriate clothing. This particularized suspicion was coupled with Cook's attempt to leave the scene of the investigative stop. It is well settled that such an attempt is an important factor, though not in itself dispositive, in determining reasonable cause for arrest. *E.g., State v. Melear, supra; State v. Baxter,* 68 Wash.2d 416, 413 P.2d 638 (1966). Particularized suspicion, when combined with an attempt to avoid an investigative stop, may constitute adequate grounds for a finding of reasonable cause. *See State v. Elliott,* 626 P.2d 423 (Utah 1981). Finally, after Cook's attempted departure was halted, the police observed the ski mask.

We conclude that the arrest of Cook was supported by reasonable cause and that the search of Cook's pocket was valid. We acknowledge that the question is a close one, and we respect our colleague's differing view. However, by purporting to invalidate the arrest at the time of the search, the lead opinion departs from practical considerations of everyday life. It plays the role of legal technician condemned by the Supreme Court in *Draper* and *Brinegar.*

### The Doctrine of Inevitable Discovery

Because the lead opinion treats the search as invalid, it is forced to seek another basis for upholding admission of the money in evidence at trial. The opinion settles upon the doctrine of inevitable discovery—a doctrine new to Idaho law. However, in this case the state at no time urged such a doctrine, nor did the district court make any findings of fact to support application of the doctrine. For these reasons, and those set forth below, we would not apply the doctrine here.

## A

Inevitable discovery is a device that some courts have employed to narrow the exclusionary rule. In order to appreciate the significance of this device, it is necessary to understand the exclusionary rule itself and its existing exceptions. The exclusionary rule bars the use at trial of evidence illegally obtained. It applies to indirect as well as direct products of unlawful police conduct. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). To use the "timeworn metaphor" of the "poisonous tree," *Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968), both the evidence unlawfully seized and the "fruit of the poisonous tree"—that is, derivative evidence to which the police are led by the tainted evidence—are barred under the exclusionary rule. However, as Justice Holmes noted in *Silverthorne*, not all evidence is inadmissible simply because it has some connection to other, tainted evidence:

> [Application of the exclusionary rule] does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it.... [251 U.S. at 392, 40 S.Ct. at 183.]

Consequently, the exclusionary rule does not apply to evidence obtained from an "independent source," even though the evidence also may have been the product or the "poisoned fruit" of an illegal search. In *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), the Supreme Court established a second exception to the exclusionary rule. The Court said that the rule should not apply to evidence that has "become so attenuated as to dissipate the taint." *Id.* at 341, 60 S.Ct. at 267.

Inevitable discovery occupies an uncertain place in this mosaic. Although called a third exception to the exclusionary rule, in reality it extends the concept of an independent source to cover hypothetical—rather than actual—sources of evidence. Thus, under the inevitable discovery doctrine, evidence illegally obtained may be admitted even though it was not obtained through an actual independent source, so long as the court is satisfied that another, hypothetical source inevitably would have yielded the evidence.

This broadening of the independent source doctrine is said to have begun in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In that case, federal narcotic agents entered a building in a manner later held to be unlawful. They arrested an occupant of the building, obtaining from him information which led to discovery of drugs and other evidence incriminating the occupant himself as well as several others, including a person named Wong Sun. The Supreme Court was asked to decide whether this derivative evidence could be used at trial. As to the building occupant, the Supreme Court said:

> The prosecutor candidly told the trial court that "we wouldn't have found those drugs except that [the building occupant] helped us to." Hence this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence "from an independent source," [citing *Silverthorne*] nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." [Citing *Nardone*.] We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." [J.] Maguire, Evidence of Guilt, 221 (1959). We think it clear that the narcotics were

"come at by the exploitation of that illegality" and hence that they may not be used against [the building occupant].

*Id.* at 487–88, 83 S.Ct. at 417.

Turning to the man named Wong Sun, the Court noted that he later had made an oral confession, implicating himself in drug transactions. The Court said:

Wong Sun's unsigned confession was not the fruit of that [illegal arrest of the building occupant], and was therefore properly admitted at trial. On the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, we hold that the connection between the arrest and the statement had "become so attenuated as to dissipate the taint." [Citing *Nardone.*]

*Id.* at 491, 83 S.Ct. at 419.

Thus, the Supreme Court actually decided the *Wong Sun* case upon the two well-established exceptions to the exclusionary rule—the "independent source" and "attenuation." The Court said nothing about inevitable discovery. However, a number of courts and commentators began to read more into the *Wong Sun* opinion. One important article suggested that the "fruit of the poisonous tree" could be unpoisoned by a government showing that the police *"would* have acquired the evidence in any event." R. Maguire, *How to Unpoison the Fruit—the Fourth Amendment and the Exclusionary Rule,* 55 J.CRIM.LAW, CRIMINOLOGY, & POLICE SCI. 307, 315 (1964) (emphasis original). That same year, a federal appellate court held that evidence obtained during an unlawful search of a criminal defendant's apartment, which led to information concerning the location of a homicide victim's body, was not barred under the exclusionary rule because the body would have been discovered in any event. *Killough v. United States,* 336 F.2d 929 (D.C.Cir.1964).

However, another federal appellate court, in a decision immediately preceding *Wong Sun,* expressed a different view:

[A] showing that the government had sufficient independent information available so that in the normal course of events it *might have* discovered the questioned evidence without an illegal search cannot excuse the illegality or cure tainted matter.... *The test must be one of actualities, not possibilities.*

*United States v. Paroutian,* 299 F.2d 486, 489 (2d Cir.1962) (emphasis added).

Despite its uncertain ancestry, the nascent doctrine of inevitable discovery continued to attract adherents. In *People v. Fitzpatrick,* 32 N.Y.2d 499, 346 N.Y.S.2d 793, 300 N.E.2d 139 (N.Y.1973), *cert. denied,* 414 U.S. 1050, 94 S.Ct. 554, 38 L.Ed.2d 338 (1973), the New York Court of Appeals adopted the emerging doctrine. When the United States Supreme Court denied certiorari in that case, Justice White dissented. He stated that he would have granted certiorari because

it is a significant constitutional question whether the "independent source" exception to inadmissibility of fruits [citing *Wong Sun* ] encompasses a hypothetical as well as an actual independent source.

*Id.* at 1050, 94 S.Ct. 554, 38 L.Ed.2d 338. Thus, the Supreme Court neither endorsed nor eschewed the inevitable discovery doctrine. By denying certiorari in *Fitzpatrick,* the Court simply allowed lower federal appellate courts and state appellate courts to continue their efforts to develop the doctrine.

More recently, although the Supreme Court still has not adopted the doctrine, it has recognized in dictum a form of inevitable discovery relating to dead bodies. In *Brewer v. Williams,* 430 U.S. 387, 406 n. 12, 97 S.Ct. 1232, 1243 n. 12, 51 L.Ed.2d 424 (1977), the Court, citing *Killough v. United States, supra,* said that even if an incriminating statement improperly obtained from a criminal defendant helped police to locate a homicide victim's body, evidence of the body itself and the location where it was found "might well be admissible on the theory that the body would have been discovered in any event." Speaking more generally in *United States v. Crews,* 445

U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980), the Supreme Court mentioned "three commonly advanced exceptions to the exclusionary rule"—the independent source, attenuation, and inevitable discovery. However, the Court did not explain or apply the inevitable discovery doctrine in that case.

The Supreme Court's current view of inevitable discovery soon may be clarified in two pending cases where certiorari has been granted: *Williams v. Nix,* 700 F.2d 1164 (8th Cir.1983) (a reprise of *Brewer v. Williams, supra* ), and *People v. Quarles,* 58 N.Y.2d 664, 458 N.Y.S.2d 520, 444 N.E.2d 984 (1982). The cases were scheduled for argument in January, 1984. Until those decisions are issued, all courts—including our own—must speculate as to whether this doctrine of uncertain ancestry has a certain future.

### B

Assuming for a moment that inevitable discovery is here to stay, we next consider the scope of this doctrine in cases characterized by unlawful searches. Time constraints do not allow a comprehensive survey. However, several illustrative cases suffice to show why the doctrine should not be applied here. Where there has been no lawful arrest, evidence obtained or identified during an invalid search has been held admissible if the evidence would have been discovered anyway as the result of intervening conduct, such as the voluntary statement of a material witness. *United States v. Miller,* 666 F.2d 991 (5th Cir. 1982). In another case, involving an assertedly invalid arrest by state officials, it was held that fingerprints taken incident to the arrest need not have been excluded from evidence in a federal prosecution where there was another, entirely separate procedure by which federal authorities would have obtained the same fingerprints. *United States v. Rowell,* 612 F.2d 1176 (7th Cir.1980).

These cases demonstrate that the doctrine of "inevitable discovery" is still struggling to establish a clear identity separate from the "independent source" doctrine. In the cases cited, the "inevitable discovery" doctrine has focused upon an actual, independent source of evidence—i.e., the voluntary statement in *Miller,* or the separate fingerprinting procedure available in *Rowell.* This conceptual overlap recently led the Court of Appeals for the Second Circuit, which earlier had expressed disapproval of the "inevitable discovery" doctrine in *Paroutian,* to criticize the conceptual foundations of the doctrine. In *United States v. Alvarez-Porras,* 643 F.2d 54, 64 (2d Cir.1981), the Second Circuit questioned the origin of the "inevitable discovery" doctrine and suggested that cases in which it has been applied "can also be explained on the basis of the more firmly established exceptions to the exclusionary rule." The court stated that the difference between "inevitable discovery" and other doctrines was so tenuous that all of the doctrines should be viewed "more as helpful guides than as rigid tests." *Id.* at 60. The court concluded that it would examine each case on an individual basis, balancing the extent of the illegality against the probative value of the evidence, "without embracing or rejecting" the doctrine of inevitable discovery. *Id.* Upon this pragmatic, rather than doctrinal basis, the court upheld admission of evidence seized during a search which was illegal only because the officers were mistaken in the belief that a warrant had been issued.

Beyond the conceptual difficulties attendant to defining inevitable discovery, most courts appear to recognize that the doctrine has a limit in search cases. Where the police knowingly have conducted a warrantless search, and where no exception to the warrant requirement exists, the evidence seized during that search has been suppressed despite the government's contention that if the search had been conducted lawfully the same evidence would have been found. *See United States v. Allard,* 634 F.2d 1182 (9th Cir.1980); *United States v. Griffin,* 502 F.2d 959 (6th Cir.1974), *cert. denied,* 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974). *But see United States*

*v. Fitzharris*, 633 F.2d 416 (5th Cir.1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981). In *Griffin*, the Court of Appeals for the Sixth Circuit stated:

> The assertion by police (after an illegal entry and after finding evidence of crime) that the discovery was "inevitable" because they planned to get a search warrant and had sent an officer on such a mission, would as a practical matter be beyond judicial review. Any other view would tend in actual practice to emasculate the search warrant requirement of the [f]ourth [a]mendment. [*Id.* at 961.]

The case now before us is unlike the cases, such as *Miller* and *Rowell*, in which the inevitable discovery doctrine has been applied. It also is dissimilar to *Alvarez-Porras*, where a pragmatic view was taken toward miscommunication about existence of a warrant. Here the police knowingly conducted a warrantless search which the lead opinion treats as invalid. Thus, accepting our colleague's view of that search as the predicate of this discussion, the case is more akin to *Griffin* and *Allard*, where application of the inevitable discovery doctrine has been rejected.

The lead opinion seeks to invoke the doctrine by reasoning that if the police had not made what the opinion treats as an invalid arrest, but instead had extended the investigative stop until reasonable cause for arrest could be established, then a valid arrest would have been made and the money would have been discovered in a search incident to that arrest. Thus, the opinion replaces the purportedly unlawful search incident to an invalid arrest with a hypothetical, proper search incident to a postulated, valid arrest.

We reject this approach upon two grounds. First, hypothesizing an extended investigative stop, rather than accepting the investigative stop which actually ripened into an arrest due to actions of the police, is inconsistent with the Idaho Supreme Court's decision in *State v. Post*, *supra*. In *Post*, a police officer who suspected the defendant of possessing marijuana searched the defendant's person and his automobile without a warrant, found incriminating evidence, and arrested the defendant. The defendant successfully challenged the validity of the search, and the state appealed. The state contended, initially, that the search was incident to a valid arrest; but the Supreme Court rejected that contention, noting that a search incident to an arrest could not precede the arrest. The state then asked the court to treat the search as incident to an investigative stop. However, the Court noted that the police officer had not engaged in a pat-down search consistent with an investigative stop, but had reached inside the defendant's pockets, exceeding the limited scope of a search permitted during an investigative stop. The court focused upon the search that actually occurred, not upon a hypothetical search that might have occurred if the police had acted differently.

Secondly, we reject the lead opinion's approach because it is inconsistent with the manner in which most other courts have applied the inevitable discovery doctrine to searches. Those courts have not sought to sanitize their cases by substituting correct government action for what they have held to be unlawful government action. Rather, they have said that even if the searches there in question were disregarded, the police would have acquired the evidence by a different means—e.g., an entirely separate law enforcement procedure, a voluntary statement, or the finding of a dead body. These courts have hypothesized, in varying degrees, about the alternate means by which the police could have obtained the evidence; but they have not hypothesized that the police would do legally what the police in those cases knowingly did illegally.

Under the lead opinion here, in any case where an illegal search had been conducted, the state would be invited to show that if the police had not searched illegally, but instead had done whatever was necessary to make the search legal (e.g., obtain a warrant or secure additional information to

establish reasonable cause), the evidence in question would have been obtained. As noted in *Griffin*, these types of showings "would as a practical matter be beyond judicial review" and "would tend in actual practice to emasculate the search warrant requirement of the [f]ourth [a]mendment."

 Again, we respect our colleague's opposing view. Despite our doubts concerning the conceptual foundation of inevitable discovery, the doctrine has attracted a following and may continue to develop in some form. However, we believe the doctrine, even if accepted, is not intended to swallow the exclusionary rule whole by substituting what the police should have done for what they really did. We conclude that the doctrine of inevitable discovery need not, and should not, be invoked in this case.